IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FILED
U.S. DISTRICT COURT
2015 FEB 20  PM 3: 52
S.D. OF N.Y.W.P.

| | |
|---|---|
| JULIE CLARIDGE and HELEN MARSH,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH AMERICAN POWER & GAS, LLC,<br><br>Defendant. | **15 CV    1261**<br><br>Civil Action No. _____<br><br>Class Action Complaint<br><br>JUDGE SEIBEL |

Plaintiffs Julie Claridge and Helen Marsh, by their attorneys, Finkelstein, Blankinship,

Frei-Pearson & Garber, LLP, as and for their class action complaint, allege, with personal

knowledge as to their own actions, and upon information and belief as to those of others, as

follows:

### Nature Of This Case

1.      This action seeks to redress the deceptive pricing practices of North American

Power & Gas, LLC ("North American Power") that have caused thousands of New York

consumers to pay considerably more for their electricity than they should otherwise have paid.

2.      North American Power engages in a classic bait-and-switch deceptive marketing

scheme aimed at consumers hoping to save on the cost of electricity.  North American Power

lures consumers into switching by offering a teaser rate that is lower than local utilities' rates for

electricity supply.  When the teaser rate expires after a couple of months, Defendant switches

customers to a variable rate, which it represents reflects "market prices for commodity."

3.      This representation is misleading.  In fact, North American Power's electricity

rates are substantially higher than commodity market prices, they are not competitive, and they

{00270066 }

do not reflect the price changes in the wholesale market. Its business model is simple: after the teaser rate expires, North American Power charges exorbitant rates that do not reflect the price changes in the market prices for electricity. As a result, New York consumers are being fleeced millions of dollars in exorbitant charges for electricity.

4.      This suit is brought pursuant to the New York General Business Law § 349, New York General Business Law § 349-d, and the common law of New York on behalf of a class of New York consumers who purchased electricity from North American Power from February 20, 2009 to the present. It seeks, *inter alia*, actual damages and refunds, punitive damages, treble damages, injunctive relief, attorneys' fees, and the costs of this suit.

### Parties

5.      Plaintiff Julie Claridge is a citizen of New York residing in Brewerton, NY. Ms. Claridge has been a North American Power customer since January 2014 and, as a result of Defendant's deceptive conduct, incurred excessive charges for electricity.

6.      Plaintiff Helen Marsh is a citizen of New York residing in Poughkeepsie, NY. Ms. Marsh has been a North American Power customer since January 2014 and, as a result of Defendant's deceptive conduct, incurred excessive charges for electricity.

7.      Defendant North American Power & Gas, LLC is a limited liability company organized under the laws of Delaware whose principal place of business is located at 20 Glover Avenue, Suite 300, Norwalk, Connecticut, 06851. Defendant has thousands of customers in New York, and it has tens of millions of dollars in combined revenues.

### Jurisdiction

8.      Defendant's status as a limited liability company renders it an "unincorporated association" pursuant to the Class Action Fairness Act ("CAFA"), and under CAFA, an

unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized. *See* 28 U.S.C. § 1332(d)(10).

9.      Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

10.     The Court has personal jurisdiction over Defendant because it conducts substantial business in this judicial district.

## Operative Facts

11.     In 1996, the electric utility industry within the State of New York was restructured. Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates. As a result, the State's electric industry is open to competition, and consumers may choose their supplier of electricity.

12.     The new energy suppliers, who compete against local utilities such as National Grid or Central Hudson, are known as Energy Services Companies, or "ESCOs." While ESCOs supply the power, the delivery of electricity to homes remains the job of the local utilities.

13.     As part of the deregulation plan, ESCOs (like North American Power) do not have to file the electricity rates they charge with the Public Service Commission or the method by which they set their rates.

14.     However, North American Power takes advantage of the deregulation and the lack of regulatory oversight in the energy market to deceptively charge New York consumers exorbitant rates for electricity. In fact, North American Power's rates are substantially higher than other ESCOs or local utilities.

{00270066 }                                    3

## North American Power Charges Deceptively High Electricity Rates

15.     North American Power engages in a classic bait and switch deception scheme. North American Power lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates.

16.     Plaintiffs' experiences were typical.

### Plaintiff Julie Claridge

17.     North American Power offered Ms. Claridge a rate that was slightly lower than her then-current rate and she agreed.  Ms. Claridge signed up with North American Power for electric supply for her own house and her daughter's house.

18.     Thereafter, North American Power sent Ms. Claridge its standard "welcome letter" that informs customers that the fixed-rate is expiring and offers another 3-months fixed rate plan at a higher rate or a month-to-month variable rate plan.  When she received that letter, Plaintiff could have cancelled her decision to switch to North American Power.  Instead Plaintiff elected to continue to use North American Power's services on the 3-months fixed rate plan.

19.     Defendant also provided Plaintiff and other New York customers with a "New York Electricity Sales Agreement" that states that after the fixed three-months, North American Power will renew the service on a month to month variable rate.  *See* Exhibit 1.  Specifically, North American Power states that its variable market based rate is based upon numerous factors, including "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges."  *Id.*

20.     North American Power's representation that its variable rates reflect price changes in the market price is false and misleading.  To the contrary, there are periods of time

during the class period and during the time Plaintiff was a North American Power customer in which the market price of electricity declined or remained steady while North American Power's prices rose. North American Power does not disclose this material fact. Nor does North American Power disclose the fact that its rates are always higher than local utilities' rates after the short-term teaser rate expires.

21.     Plaintiff agreed to become North American Power's customer when North American Power offered a fixed rate of $0.0549 for three months from January to March 2014. After the expiration of the fixed rate plan, Plaintiff renewed 3-months fixed rate plan at a rate of $0.0649. However, North American Power charged Plaintiff a variable rate despite its promise to extend the 3-months rate plan. Thereafter, North American Power charged Plaintiff $0.1599 per kilowatt hour, almost three times the rate Plaintiff had agreed to.

22.     From January 2014 until June 2014 (during which time Plaintiff was a North American Power customer), the price per kilowatt hour that North American Power charged went up from $0.05490 per kilowatt hour to $0.1599 per kilowatt hour, an increase of almost 200%. At no time during this period did North American Power charge less than $0.05490 per kilowatt hour.

23.     In contrast, the price that National Grid charged in January 2014 was $0.07285 per kilowatt hour, and it was only $0.06735 per kilowatt hour in June 2014. At no time did National Grid charge more than $0.11693 per kilowatt hour. In other words, while the local utility managed to lower electricity rates, North American Power's more than doubled. In fact, North American Power's electricity rate was at one point more than two times higher than National Grid's rate.

24.     For example, from January 7, 2014 to February 5, 2014, Plaintiff paid $17.57 for

320 KWH, or $0.05490 per KWH.  If Plaintiff had purchased her electric supply from National

Grid, she would have paid $23.31, or $0.07285 per KWH.  However, from April 5, 2014 to May

8, 2014, Plaintiff paid $41.09 for 257 KWH, or $0.15990 per KWH.  If Plaintiff had purchased

her electric supply from National Grid, she would have paid $15.48, or $0.06024 per KWH.

25.     The following table, which includes the monthly electricity rates charged by

North American Power to Plaintiff, the rates that would have been charged by National Grid, and

the Day-ahead Locational Marginal Prices demonstrates that North American Power's rates are

not based on price changes in the market price of electricity:

| Billing Period | North American Power Per KWH | National Grid Per KWH | Day-ahead Locational Marginal Price (LMP) |
|---|---|---|---|
| 1/7/14-2/5/14 | $0.05490 | $0.07285 | $0.1253 |
| 2/5/14-3/8/14 | $0.05490 | $0.11693 | $0.1075 |
| 3/8/14-4/5/14 | $0.05490 | $0.08020 | $0.0603 |
| 4/5/14-5/8/14 | $0.15990 | $0.06024 | $0.0399 |
| 5/8/14-6/6/14 | $0.15990 | $0.06735 | $0.0333 |
| 6/6/14-7/7/14 | $0.13990 | $0.07085 | $0.0375 |
| 7/7/14-8/6/14 | $0.13990 | $0.07959 | $0.0335 |

26.     Based on the data in this table, the following chart graphically demonstrates the

disconnect between North American Power's rates, National Grid's electricity rates, and

wholesale market prices:



**Plaintiff Helen Marsh**

27.    North American Power offered Ms. Marsh a 4-month fixed rate at $0.0699 that was slightly lower than her then-current rate and she agreed.

28.    After the fixed four-months, North American Power changed Ms. Marsh's electric rate to a month to month variable rate.  Defendant provided Plaintiff and other New York customers with a "New York Electricity Sales Agreement" that states that after the months on fixed-rates, North American Power will renew the service on a month to month variable rate. *See* Exhibit 2, New York Electricity Sales Agreement from North American Power's Website. Specifically, North American Power states that its variable market based rate is based upon numerous factors, including "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges."

29.     North American Power's representation that its variable rates reflect price changes in the market price is false and misleading. To the contrary, there are periods of time during the class period and during the time Plaintiff was a North American Power customer in which the market price of electricity declined or remained steady while North American Power's prices rose. North American Power does not disclose this material fact. Nor does North American Power disclose the fact that its rates are always higher than local utilities rates after the short-term teaser rate expires.

30.     After Plaintiff's four-month fixed rate expired, North American Power charged Plaintiff $0.1739 per kilowatt hour, almost three times the rate Plaintiff had agreed to.

31.     From January 2014 until January 2015 (during which time Plaintiff was a North American Power customer), the price per kilowatt hour that North American Power charged went up from $0.06990 per kilowatt hour to $0.1739 per kilowatt hour, an increase of almost 200%. At no time during this period did North American Power charge less than $0.06990 per kilowatt hour.

32.     In contrast, the price that Central Hudson charged in January 2014 was $0.06402 per kilowatt hour, and it was only $0.07983 per kilowatt hour in January 2015. At no time did Central Hudson charge more than $0.14245 per kilowatt hour. In other words, while the local utility managed to lower electricity rates, North American Power's more than doubled. In fact, North American Power's electricity rate was at one point more than two times higher than Central Hudson's rate.

33.     For example, from January 17, 2014 to March 17, 2014, Plaintiff paid $168.46 for 2410 KWH, or $0.0699 per KWH. If Plaintiff had purchased her electric supply from Central Hudson, she would have paid $154.28, or $0.06402 per KWH. However, from November 14,

2014 to January 15, 2015, Plaintiff paid $425.36 for 2446 KWH, or $0.1739 per KWH. If Plaintiff had purchased her electric supply from Central Hudson, she would have paid $195.26, or $0.07983 per KWH.

34.     The following table, which includes the monthly electricity rates charged by North American Power to Plaintiff, the rates that would have been charged by Central Hudson, and the Day-ahead Locational Marginal Prices demonstrates that North American Power's rates are not based on price changes in the market price of electricity:

| Billing Period | North American Power Per KWH | Central Hudson Per KWH | Day-ahead Locational Marginal Price (LMP) |
|---|---|---|---|
| 1/17/14-3/17/14 | $0.0699 | $0.0640 | $0.1190 |
| 3/18/14-5/18/14 | $0.0699 | $0.1425 | $0.0415 |
| 5/19/14-7/16/14 | $0.1574 | $0.0698 | $0.0347 |
| 7/17/14-9/17/14 | $0.1499 | $0.0722 | $0.0307 |
| 9/17/14-11/13/14 | $0.1599 | $0.0902 | $0.0284 |
| 11/13/14-1/15/15 | $0.1739 | $0.0798 | $0.0353 |

35.     Based on the data in this table, the following chart graphically demonstrates the disconnect between North American Power's rates, National Grid's electricity rates, and wholesale market prices:



36.    While local utilities' electricity rates may demonstrate less fluctuation over that of the wholesale market, over time, the rates utilities like Central Hudson and National Grid charge are an accurate reflection of rates that are based on prevailing market conditions. In other words, the electricity rates that utilities charge are an accurate measure of what market based rates should be. That North American Power's rates were always substantially higher than the local utilities' rates therefore demonstrates that North American Power's rates are not in fact based on prevailing market conditions.

37.    A reasonable consumer would understand that the price the local utility or other ESCO charges is part of prevailing market conditions and that a price based on prevailing market conditions would be consistent with the price charged by the local utility or other ESCO. However, North American Power's prices are substantially higher than local utilities' rates as well as the rates other ESCO charge.

38.     All that North American Power offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCO or local utilities.  Other than potential price savings, North American Power offers nothing of value that other ESCO or local utilities do not offer.

39.     Thus, North American Power's statements with respect to the electric rates it will charge are materially misleading because customers do not receive a market based price or a rate that reflects the market pricing of electricity.  Instead, consumers are charged rates that are substantially higher.  North American Power fails to disclose this material fact to its customers.

40.     North American Power's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer who knows the truth about North American Power's exorbitant rates would choose North American Power as an electricity supplier.  Other than potential price savings, there is nothing to differentiate North American Power from other ESCO or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with North American Power.

41.     North American Power intentionally makes these misleading statements regarding its electric rates so that reasonable consumers like Plaintiffs would rely upon its statements and switch their electric supplier to North American Power.

## Class Action Allegations

42.     Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of all North American Power New York State customers who were charged a variable rate from February 20, 2009 to the present.

43.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

44.     This action is brought as a class action for the following reasons:

a.     The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.     There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i.     whether Defendant violated N.Y. G.B.L. § 349 and N.Y. G.B.L. § 349-d;

ii.     whether Defendant breached its contract with New York consumers by charging a rate higher than that provided for in the agreement;

iii.     whether Defendant breached its duty of good faith and fair dealing by charging a rate higher than justified by market related factors;

iv.     whether Defendant is being unjustly enriched by deceptively charging rates substantially over those available in the market;

v.     whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

vi.     whether Defendant should be enjoined from continuing to charge exorbitant rates based on undisclosed factors;

c.     The claims asserted by Plaintiffs are typical of the claims of the members of the Class;

{00270066 }                                    12

d.    Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

e.    Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.    Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain their ill-gotten gains;

ii.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

iii.    When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

iv.    A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense and ensure uniformity of decisions;

v.    The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.    Defendant has acted on grounds generally applicable to Class members, making class-wide monetary relief appropriate.

45.     Defendant's violations of N.Y. G.B.L. § 349, N.Y. G.B.L § 349-d and the common law of New York are applicable to all members of the Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### (Violation of N.Y. General Business Law § 349)

46.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-45 above as if fully set forth herein.

47.     The New York General Business Law § 349 provides, *inter alia*:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

N.Y. Gen. Bus. Law § 349(a).

48.     Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the rates it charges for electricity, as described above, constitute deceptive acts or practices in the conduct of business, trade or commerce in violation of the New York General Business Law.

49.     Defendant failed to inform customers that its rates are substantially higher than those based on the market price of electricity.  That information would have been material to any consumer deciding whether to purchase electricity from North American Power.

50.     Plaintiffs and the other members of the Class entered into agreements to purchase electricity from North American Power for personal, family or household use and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of New York General Business Law.

51.     As a consequence of Defendant's wrongful actions, Plaintiffs and the other

members of the Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had North American Power charged a rate based on the market price of electricity or had they not switched to North American Power from their previous supplier.

52.      Plaintiffs and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from North American Power if the true facts concerning its rates had been known.

53.      By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for actual damages or fifty dollars ($50), whichever is greater; punitive damages; injunctive relief, attorneys' fees, and the costs of this suit.

54.      Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiffs and the other members of the Class.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Violation of N.Y. General Business Law § 349-d)

55.      Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-54 above as if fully set forth herein.

56.      New York General Business Law § 349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

57.      New York General Business Law § 349-d(10) provides that "any person who has been injured by reason of any violation of this section may bring an action in his or her own

name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such action. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

58.    Defendant knowingly and willfully misrepresented to Plaintiffs and the Class that its rates are based on market price of electricity when its rates are not, in fact, reflective of the market. Defendant knowingly and willfully fails to inform consumers of the material fact that its rates are substantially higher than those otherwise available in the market.

59.    Through its conduct described above, Defendant has engaged in deceptive acts and practices that resulted in injury to Plaintiffs and other members of the Class.

60.    By reason of the foregoing, Defendant has violated New York General Business Law § 349-d, and should be enjoined from continuing to fail to disclose that its rates are substantially higher than those otherwise available in the market and misrepresenting that its rates are competitive and reflective of market factors. Defendant is also liable to Plaintiffs and other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial but not less than $500.00 for each violation, such damages to be trebles, plus attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

61.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-60 above as if fully set forth herein.

62.    Plaintiffs and the Class entered into valid contracts with North American Power for the provision of electricity supply.

{00270066 }                                    16

63.    Under the contract, North American Power promised to charge a rate for electricity that is based on "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges."

64.    Pursuant to the contract, Plaintiffs and the Class agreed to pay that rate, and they did so.

65.    However, North American Power failed to perform its obligations under the contract because it charged a rate for electricity that was not based on the factors upon which the parties agreed the rate would be based.

66.    The electricity rates, and the grounds on which North American Power could purportedly exercise its discretion to charge a variable rate, were material terms of the contract.

67.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had North American Power based its rate on the agreed upon factors.

68.    By reason of the foregoing, Defendant is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

### FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

69.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-68 above as if fully set forth herein.

70.    Every contract in New York contains an implied covenant of good faith and

fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

71.    Implied in the terms of the contract was a covenant of good faith and fair dealing. This implied covenant prevents North American Power from engaging in conduct, and exercising its discretion, in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the consumers.

72.    North American Power breached the implied covenant of good faith and fair dealing by charging Plaintiffs and other members of the Class exorbitant electricity rates. Under the terms of the contract, North American Power had the discretion to charge Plaintiffs and the members of the class for electricity based on a "variable market price" comprised of specified factors, including "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges." North American Power's failure to exercise its discretion in good faith is evidenced by the electricity rates North American Power charged Plaintiffs and other members of the Class which were not market based but were instead outrageously high and contrary to the reasonable expectations of the parties. North American Power charged electricity rates in bad faith, unreasonably and in a manger inconsistent with the reasonable expectations of Plaintiff and other members of the Class.

### FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

73.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1-72 above as if fully set forth herein. Plaintiffs specifically exclude those allegations that relate to their breach of contract claim. This claim is plead in the alternative.

{00270066 }                                 18

74.     By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit at the expense of Plaintiffs and the other members of the Class. Defendant appreciated the benefit and it would be inequitable for Defendant to retain such benefit without being required to compensate Plaintiffs and other members of the Class for the damages that they have suffered as a result of Defendant's actions.

75.     It would be unjust and inequitable for Defendant to retain the payments Plaintiffs and the Class made for excessive charges.

76.     By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

WHEREFORE, Plaintiffs respectfully request that the Court should enter judgment against Defendant as follows:

1.     Certifying this action as a class action, with a class as defined above;

2.     On Plaintiffs' First Cause of Action, awarding against Defendant for actual damages that Plaintiffs and the other members of the Class have suffered or fifty dollars ($50), whichever is greater, plus punitive and treble damages;

3.     On Plaintiffs' Second Cause of Action, awarding against Defendant actual damages or five hundred dollars ($500), whichever is greater, plus punitive and treble damages;

4.     On Plaintiffs' Third Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions;

5.     On Plaintiffs' Fourth Cause of Action, awarding against Defendant damages that Plaintiff and other members of the Class have suffered as a result of Defendant's actions;

6.      On Plaintiffs' Fifth Cause of Action, awarding against Defendant's damages that Plaintiff and the other members of the Class have suffered;

7.      Awarding Plaintiffs and the Class punitive damages and injunctive relief;

8.      Awarding Plaintiffs and the Class interest, costs and attorneys' fees; and

9.      Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by jury.

Dated:     February 20, 2015
            White Plains, New York

                    **FINKELSTEIN, BLANKINSHIP,**
                    **FREI-PEARSON & GARBER, LLP**

By:   

                    Todd S. Garber
                    D. Greg Blankinship
                    Shin Y. Hahn
                    1311 Mamaroneck Avenue
                    White Plains, New York 10605
                    Tel: (914) 298-3281
                    Fax: (914) 824-1561
                    tgarber@fbfglaw.com
                    gblankinship@fbfglaw.com
                    shahn@fbfglaw.com

                    Matthew R. Mendelsohn
                    **MAZIE SLATER KATZ**
                    **& FREEMAN, LLC**
                    103 Eisenhower Parkway
                    Roseland, New Jersey 07068

Matthew D. Schelkopf (*pro hac vice*
forthcoming)
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

*Attorneys for Plaintiffs and the putative
class*

# EXHIBIT 1

NORTH AMERICAN POWER AND GAS, LLC. ("NAP")
New York Electricity Sales Agreement
Customer Disclosure Statement and Terms and Conditions

| | |
|---|---|
| **Price** | 5.49 cents per kWh<br>For 100% renewable energy certificates the price is 1.95 cents per kWh above the market rate. |
| **Fixed or Variable** | Fixed **3 months**<br>Thereafter, unless otherwise notified by Customer, the Agreement will automatically renew on a month to month variable rate. |
| **Length of the agreement and end date** | This agreement will begin on the next applicable meter read date after the utility processes Customer enrollment and the end date for North American Power supply service will be after **three** billing cycles. |
| **Process customer may use to rescind the agreement without penalty** | If a residential customer, Customer may rescind by contacting NAP (See Contact Information section) within 3 business days of receipt of the sales agreement. Please provide name, address, phone number, account number, and a statement that you are rescinding this Agreement. |
| **Amount of Early Termination Fee and method of calculation** | This Agreement has no termination fee. |
| **Amount of Late Payment Fee and method of calculation** | If Customer does not pay its bill on time, Customer may be subject to termination of its electricity supply services and the suspension of its supply services under procedures approved by NYPSC. If NAP directly invoices Customer, Customer is required to pay NAP's invoices within twenty (20) days from the invoice date and NAP reserves the right to charge a late payment fee each month in the amount of 1.5% of the past due invoice amount. If any payment is returned, Customer will be required to pay a twenty five ($25.00) dollar fee for each occurrence. If Customer is a non-residential customer, failure to make full payment of NAP charges due on any consolidated bill prepared by Customer's local distribution utility will be grounds for disconnection of utility services and electricity supply service in accordance with NYPSC rules and regulations on the termination of service to non-residential customers. |
| **Provisions for renewal of the agreement** | North American Power must clearly inform Customer in writing, not less than 30 days nor more than 60 days before the end of the current term of Customer Agreement, or any renewal terms and Customer option to reject the renewal terms. Customer will not be charged a termination fee if Customer objects to renewal within 3 business days after customer receives the first billing statement under the agreement as renewed. If North American Power makes any changes to Customer renewed agreement other than a rate change or a change from a fixed to a variable rate as specified in the initial sales agreement, any such changes will be considered material and will require that North American Power obtain Customer express consent for renewal. |
| **Conditions under which savings to the customer are guaranteed** | No savings are guaranteed as the utility price may vary during the term of this Agreement. |

**Service.** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Local Distribution Utility ("LDU") or, if applicable, after the date on which Customer is eligible to participate in the utility ESCO Referral Program. NORTH AMERICAN POWER AND GAS, LLC ("NAP" and/or "North American Power") shall supply the customer's electricity pursuant to this Agreement. By executing, approving and/or not rescinding this Agreement under NAP's terms or the utility's ESCO Referral Program, Customer agrees to initiate service and begin enrollment. By enrolling with NAP, Customer acknowledges that this agreement is an agreement to initiate electricity supply services with NAP. NAP is approved by the New York State Public Service Commission ("NYPSC") to act as an Energy Service Company ("ESCO") and has entered into a service agreement with Customer's Utility. The NYPSC does not regulate the price of electricity or other charges found in this Agreement. Customer is at least 18 years old and fully authorized to enter into this Agreement. NAP is a retail marketer of electricity and not Customer's LDU. Customer's LDU will continue to perform the following functions; deliver electricity, read meter, send bill, and make repairs. LDU will also respond to emergencies and provide other traditional utility services. Customer understands that Customer is not required to choose a competitive supplier, and may continue to have the LDU supply Customer electricity.

**Term.** The term of this Sales Agreement will begin on the next applicable meter read date after the LDU processes Customer enrollment and will continue until the end date specified in the Disclosure Statement above unless this Sales Agreement is renewed or terminated pursuant to Termination section of this Agreement . Upon completion of any initial or renewal term of this Agreement, the Agreement will automatically renew on a month to month variable market rate basis on the same terms as contained herein. However, if NAP materially changes its terms and conditions, other than variable market based pricing, NAP must obtain customer's authorization (written or verifiable oral) after customer has received a written notification of the new terms not less than 30 days nor more than 60 days prior to the date of the new terms and conditions (the "Renewal Term"). Customer shall have 3 business days from receipt of the first billing statement of customers Renewal Term to reject renewal terms and cancel renewal agreement. The Customer may provide written notice of termination to NAP at its email or mailing address or call NAP as outlined in the Contact Information section of this Agreement. Customer may also call their delivery company to terminate the agreement. NAP may terminate this Agreement by providing 15 days written notice to the Customer.

**Open Price.** Approximately each month the customer bill will be calculated by multiplying (i) the price of electricity by (ii) the amount of electricity used in the billing cycle plus (iii) applicable taxes, fees, and charges levied by the utility for distribution and other services. NORTH AMERICAN POWER's price for all electricity sold under this Agreement shall be fixed for the term indicated on the Disclosure Statement above, and is guaranteed not to change for the term listed on the Disclosure Statement or any renewal notice. Variable market based rates will be calculated on the method stated above to include any market prices for commodity, transportation, balancing fees, storage charges, NORTH AMERICAN POWER fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges. .

**Agency.** Customer hereby appoints NAP as agent for the purposes of acquiring the supplies necessary to meet Customer's electricity needs and arranging to deliver electricity to customer.

**Title.** All electricity sold under this Agreement shall be delivered to a location considered the "Point of Delivery," which for electricity shall be at the NY ISO NORTH AMERICAN POWER load bus, and shall constitute the point at which the sale occurs and title passes from NORTH AMERICAN POWER to the Customer.

**Measurement.** The measurement of the quantity of electricity delivered under this Agreement shall be determined by the meter readings and/or estimates performed by the LDU.

**Billing and Payment.** Unless otherwise agreed to in writing, NAP or LDU will invoice monthly for electricity supplied under this Agreement. Customer will pay each invoice in full within twenty (20) calendar days of the invoice date or be subject to a late payment charge of 1.5% per month. In most cases Customer should receive a single invoice for both commodity and delivery costs from the LDU. Customer payments remitted in response to a consolidated bill shall, to the extent required, be pro-rated in accordance with procedures adopted by the NYPSC. In the event Customer fails to provide payment when due, NAP shall have the right to terminate commodity service upon fifteen (15) calendar days written notice to the Customer. Failure to make full payment of NAP charges due on any consolidated bill prepared by the LDU for NAP will be grounds for disconnection of utility services and commodity service in accordance with NYPSC rules and regulations on the termination of service to residential customers. Customer payments remitted in response to a consolidated bill shall be pro-rated (when so required) in accordance with procedures adopted by the NYPSC. A $25 fee will be charged for all returned payments. NAP reserves the right to pass along increases in charges which are a result of Public Service Commission, LDU, NY-ISO, any regional transmission authority, FERC (Federal Energy Regulatory Commission) orders or actions or any other body having authority.

**Cancellation Process.** There is no cancellation fees associated with this Agreement. If Customer is a residential customer, Customer may cancel within 3 business days of receipt of this agreement (the "Cancellation Period") by contacting NAP at its contact information listed in the Contact Information section. If cancellation is not requested within 15 days of the next meter read, the Customer may request a special meter read which is typically subject to a service charge. Customer is liable for all of NORTH AMERICAN POWER's charges while Customer may be returning to the LDU or selecting another supplier. A bill will be rendered in approximately twenty (20) days after the final scheduled meter reading or if access is unavailable, an estimate of consumption will be used in the bill, which will be trued up subsequent to the final meter reading.

**Acceptance and Amendments.** NORTH AMERICAN POWER may amend the terms of this Agreement (other than price) at any time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof. Any change to this Agreement, other than the Open Price provision, shall require the Customer's affirmative consent, documented under one of the three methods specified in the NYPSC Uniform Business Practices.

# EXHIBIT 2

**Service.** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Local Distribution Utility ("LDU") or, if applicable, after the date on which Customer is eligible to participate in the utility ESCO Referral Program. NORTH AMERICAN POWER AND GAS, LLC ("NAP" and/or "North American Power") shall supply the customer's electricity pursuant to this Agreement. By executing, approving and/or not rescinding this Agreement under NAP's terms or the utility's ESCO Referral Program, Customer agrees to initiate service and begin enrollment. By enrolling with NAP, Customer acknowledges that this agreement is an agreement to initiate electricity supply services with NAP. NAP is approved by the New York State Public Service Commission ("NYPSC") to act as an Energy Service Company ("ESCO") and has entered into a service agreement with Customer's Utility. The NYPSC does not regulate the price of electricity or other charges found in this Agreement. Customer is at least 18 years old and fully authorized to enter into this Agreement. NAP is a retail marketer of electricity and not Customer's LDU. Customer's LDU will continue to perform the following functions: deliver electricity, read meter, send bill, and make repairs. LDU will also respond to emergencies and provide other traditional utility services. Customer understands that Customer is not required to choose a competitive supplier, and may continue to have the LDU supply Customer electricity.

**Term.** The term of this Sales Agreement will begin on the next applicable meter read date after the LDU processes Customer enrollment and will continue until the end date specified in the Disclosure Statement above unless this Sales Agreement is renewed or terminated pursuant to Termination section of this Agreement . Upon completion of any initial or renewal term of this Agreement, the Agreement will automatically renew on a month to month variable market rate basis on the same terms as contained herein. However, if NAP materially changes its terms and conditions, other than variable market based pricing, NAP must obtain customer's authorization (written or verifiable oral) after customer has received a written notification of the new terms not less than 30 days nor more than 60 days prior to the date of the new terms and conditions (the "Renewal Term"). Customer shall have 3 business days from receipt of the first billing statement of customers Renewal Term to reject renewal terms and cancel renewal agreement. The Customer may provide written notice of termination to NAP at its email or mailing address or call NAP as outlined in the Contact Information section of this Agreement. Customer may also call their delivery company to terminate the agreement. NAP may terminate this Agreement by providing 15 days written notice to the Customer.

**Open Price.** Approximately each month the customer bill will be calculated by multiplying (i) the price of electricity by (ii) the amount of electricity used in the billing cycle plus (iii) applicable taxes, fees, and charges levied by the utility for distribution and other services. NORTH AMERICAN POWER's price for all electricity sold under this Agreement shall be fixed for the term indicated on the Disclosure Statement above, and is guaranteed not to change for the term listed on the Disclosure Statement or any renewal notice. Variable market based rates will be calculated on the method stated above to include any market prices for commodity, transportation, balancing fees, storage charges, NORTH AMERICAN POWER fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges. .

**Agency.** Customer hereby appoints NAP as agent for the purposes of acquiring the supplies necessary to meet Customer's electricity needs and arranging to deliver electricity to customer.

**Title.** All electricity sold under this Agreement shall be delivered to a location considered the "Point of Delivery," which for electricity shall be at the NY ISO NORTH AMERICAN POWER load bus, and shall constitute the point at which the sale occurs and title passes from NORTH AMERICAN POWER to the Customer.

**Measurement.** The measurement of the quantity of electricity delivered under this Agreement shall be determined by the meter readings and/or estimates performed by the LDU.

**Billing and Payment.** Unless otherwise agreed to in writing, NAP or LDU will invoice monthly for electricity supplied under this Agreement. Customer will pay each invoice in full within twenty (20) calendar days of the invoice date or be subject to a late payment charge of 1.5% per month. In most cases Customer should receive a single invoice for both commodity and delivery costs from the LDU. Customer payments remitted in response to a consolidated bill shall, to the extent required, be pro-rated in accordance with procedures adopted by the NYPSC. In the event Customer fails to provide payment when due, NAP shall have the right to terminate commodity service upon fifteen (15) calendar days written notice to the Customer. Failure to make full payment of NAP charges due on any consolidated bill prepared by the LDU for NAP will be grounds for disconnection of utility services and commodity service in accordance with NYPSC rules and regulations on the termination of service to residential customers. Customer payments remitted in response to a consolidated bill shall be pro-rated (when so required) in accordance with procedures adopted by the NYPSC. A $25 fee will be charged for all returned payments. NAP reserves the right to pass along increases in charges which are a result of Public Service Commission, LDU, NY-ISO, any regional transmission authority, FERC (Federal Energy Regulatory Commission) orders or actions or any other body having authority.

**Cancellation Process.** If Customer is a residential customer, Customer may cancel within 3 business days of receipt of this agreement (the "Cancellation Period") without penalty or cancellation fee by contacting NAP at its contact information listed in the Contact Information section. If cancellation is not requested within 15 days of the next meter read, the Customer may request a special meter read which is typically subject to a service charge. Customer is liable for all of NORTH AMERICAN POWER's charges while Customer may be returning to the LDU or selecting another supplier. A bill will be rendered in approximately twenty (20) days after the final scheduled meter reading or if access is unavailable, an estimate of consumption will be used in the bill, which will be trued up subsequent to the final meter reading. If Customer terminates this Agreement during the Initial Term or any subsequent Renewal Term after the applicable cancellation period, Customer will pay an early termination cost recovery fee ("ETF"). Such fee will be ten dollars ($10.00) per month for each month remaining on the Agreement, but will not exceed; one hundred dollars ($100.00) for any Agreement with a remaining term of less than 12 months; or two hundred dollars ($200.00) for any Agreement with a remaining term of more than 12 months.

**Acceptance and Amendments.** NORTH AMERICAN POWER may amend the terms of this Agreement (other than price) at any

time, consistent with any applicable law, rule or regulation, by providing notice to Customer of such amendment at least thirty (30) days prior to the effective date thereof. Any change to this Agreement, other than the Open Price provision, shall require the Customer's affirmative consent, documented under one of the three methods specified in the NYPSC Uniform Business Practices.

**Emergency Service Contacts.** In the event of an electric power outage or other emergency, please use the following toll-free numbers to directly contact your utility:

| Central Hudson Gas & Electric | Rochester Gas & Electric | Orange & Rockland Electric | National Grid | National Fuel Gas | Consolidated Edison | New York State Electric & Gas |
|---|---|---|---|---|---|---|
| 800-527-2714 | 888-253-8888 | 877-434-4100 | 800-892-2345 | 800-444-3130 | 800-752-6633 | 800-572-1131 |

**Dispute Resolution.** In the event of a billing dispute or a disagreement involving NAP's service hereunder, the parties will use their best efforts to resolve the dispute. Customer should contact NAP by telephone or in writing as provided below in NAP's Contact Information. The dispute or complaint relating to a residential customer may be submitted by either party at any time to the NYPSC pursuant to its Complaint Handling Procedures ("Procedures") by calling the NYPSC at 1-888-697-7728 or by writing to the NYPSC at: New York State Department of Public Service, Office of Consumer Services, Three Empire State Plaza, Albany, New York 12223, or through its website at: http://www.dps.ny.gov. Customer must pay the bill in full, except for the specific disputed amount, during the pendency of the dispute.

**NAP Contact Information.** Customer may contact NAP by telephone at 1-888-313-9086 Monday to Friday, 9AM EST to 5PM EST or email at customercare@napower.com, or by writing to us at 20 Glover Avenue, Norwalk CT 06850. If Customer calls NAP during business hours regarding a utility emergency, Customer will either be transferred directly to the LDU or given the number of the LDU for Customer to call the LDU directly. If Customer calls outside of these hours Customer will be given the LDU emergency phone number to call. If Customer calls NAP outside of normal business hours Customer will be prompted to call back during normal business hours.

**Customer Protections.** The services provided by NORTH AMERICAN POWER to Customer are governed by the terms and conditions of this Agreement. This agreement is governed by the Home Energy Fair Practices Act ("HEFPA"). NAP will provide at least 15 days notice prior to the cancellation of service to Customer. Customer may obtain additional information by contacting NORTH AMERICAN POWER at its contact information above or the NYPSC at 1-888-697-7728, or by writing to the NYPSC at: New York State Department of Public Service, Office of Consumer Services, Three Empire State Plaza, Albany, New York 12223, or through its website at http://www.dps.ny.gov.

**Default Liability.** Under no circumstances shall Customer or NAP be liable for any direct, punitive, incidental, consequential, exemplary, indirect, third-party claims or other damages whether such claims are based on contract, warranty, tort, negligence, strict liability or otherwise, or for lost profits arising from a breach of this Agreement.

**Choice of Laws.** Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms hereof shall lie exclusively in the State of New York. This Agreement shall be construed under and shall be governed by the laws of the State of New York without regard to application of its conflicts of laws and principles.

**No Warranties.** UNLESS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NORTH AMERICAN POWER PROVIDES AND CUSTOMER RECEIVES NO WARRANTIES, EXPRESS OR IMPLIED, STATUTORY, OR OTHERWISE AND NAP SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**Force Majeure.** North American Power will make commercially reasonable efforts to provide electricity hereunder but North American Power does not guarantee a continuous supply of electricity to you. Certain causes and events out of the control of North American Power ("Force Majeure Events") may result in interruptions in service. North American Power will not be liable for any such interruptions caused by a Force Majeure Event, and North American Power is not and shall not be liable for damages caused by Force Majeure Events. Force Majeure Events shall include acts of God, fire, flood, storm, terrorism, war, civil disturbance, acts of any governmental authority, accidents, strikes, labor disputes or problems, required maintenance work, inability to access the LDU system, non-performance by the LDU (including, but not limited to, a facility outage on its electricity distribution lines), changes in laws, rules, or regulations of any governmental authority or any other cause beyond North American Power's control. The term "Force Majeure" as used in this Agreement shall also mean any act or cause not reasonably within the control of NORTH AMERICAN POWER and which by the exercise of due diligence, NORTH AMERICAN POWER is unable to prevent or overcome, including, but not limited to, any act or cause which is deemed a "Force Majeure" by the Utility or any transportation or transmitting entity. If NORTH AMERICAN POWER is rendered unable, wholly or in part, by Force Majeure to perform or comply with any obligations or conditions of this Agreement, we shall give immediate notice to the maximum extent practicable in writing and provide reasonably full particulars to the other party. Such obligations or conditions, so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, and NORTH AMERICAN POWER shall be relieved of liability and shall suffer no prejudice for failure to perform the same during the period. If NORTH AMERICAN POWER claims suspension of obligations, we must in good faith attempt to mitigate and/or terminate the Force Majeure. If at some future date there is a change in any law, rule, regulation or pricing structure whereby NORTH AMERICAN POWER is prevented, prohibited or frustrated from carrying out the terms of the Agreement, then, at the sole discretion of NORTH AMERICAN POWER this Agreement may be cancelled.

**Taxes and Laws.** Except as otherwise provided in the Agreement or provided by law, all taxes of whatsoever kind, nature and description, due and payable with respect to Customer's performance of its obligations under this Agreement, shall be paid by

Customer. The parties' obligations under this Agreement are subject to any validly issued present and future legislation, orders, rules, regulations of a duly constituted governmental authority having jurisdiction over this Agreement or the services to be provided herein.

**Assignment.** The Customer may not assign its interest or obligations under this Agreement without the written consent of NORTH AMERICAN POWER. NORTH AMERICAN POWER may sell, transfer, pledge, or assign the accounts, revenues, and proceeds hereof in connection with any financial agreement. NORTH AMERICAN POWER may assign this Agreement to another energy supplier, energy services company, or other entity authorized by the NYPSC. NORTH AMERICAN POWER must provide the Customer 30 days' notice before the next meter reading prior to the assignment of this Agreement to another service provider. Upon such assignment, Customer agrees that NORTH AMERICAN POWER shall have no further obligations hereunder.

**Authorization.** Customer authorizes NORTH AMERICAN POWER to obtain and review information including, but not limited to the customer's credit history from credit reporting agencies, and LDU information including, but not limited to, consumption history and future electricity usage, standard offer service type, billing determinants, credit information, payment information, public assistance status, existence of medical emergencies, status as to whether Customer has a medical emergency, is human needs, elderly, blind or disabled and data applicable to cold weather periods under PSL § 32 (3); and information pertaining to PSL § 33, tax status and eligibility for economic development or other incentives. This information may be used by NORTH AMERICAN POWER to determine whether it will commence and/or continue to provide energy supply service to Customer. Customer's execution of this Agreement shall constitute authorization for the release of this information to NORTH AMERICAN POWER, and to third parties who need to use or be aware of such information in connection with Customer electric generation services, as well as to its affiliates and subcontractors for any billing, collection and/or marketing purposes. This authorization will remain in effect during the Initial Term and any Renewal Term of this Agreement. Customer may rescind this authorization at any time by providing written notice thereof to NORTH AMERICAN POWER or calling NORTH AMERICAN POWER at 1-888-313-9086. NORTH AMERICAN POWER reserves the right to cancel this Agreement in the event Customer rescinds the authorization.

**Miscellaneous.** Customer will promptly notify NAP if there are any material changes in Customer's energy consumption. For purposes of accounting, both parties, accept the quantity, quality and measurements determined by Customer's LDU. Except as provided by law Customer will pay all taxes due and payable with respect to customer obligations under this agreement. This agreement and the Enrollment Form or Welcome Letter reflect Customer's entire agreement with NAP and supersede any oral or written statements made in connection with this agreement or Customer electricity supply. This agreement is subject to any future legislation, orders, rules, regulations, or Customer LDU tariff or policy changes. There may be a delay before Customer LDU switches Customer electricity supply to NAP; NAP is not responsible for any such delays.