# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE CLARIDGE and HELEN MARSH, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>NORTH AMERICAN POWER & GAS, LLC,<br><br>    Defendant. | Civil Action<br><br><br>Case No: 15-cv-1261 |

---

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

---

D. Greg Blankinship
Todd S. Garber
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue
White Plains, New York 10605

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068

Matthew D. Schelkopf
Joseph B. Kenney
**MCCUNEWRIGHT LLP**
1055 Westlakes, Suite 300
Berwyn, Pennsylvania 19312

*Attorneys for Plaintiffs and the putative class*

{00277427 }

# TABLE OF CONTENTS

Page No.

INTRODUCTION……………………………………………………………………...1

COMMON FACTS…………………………………………………………………...2

    A.  NAPG Sells Retail Electricity To New York Consumers………………………………..2

    B.  All NAPG Customers Receive
        The Same Disclosures Regarding NAPG's Variable Rate………………………………..3

    C.  NAPG Maintains Accurate And Reliable Data That
        Identifies Class Members And The Rates They Were Charged…………………………..5

    D.  Plaintiffs' Claims Are Typical Of Class Members' Claims……………………………6

        1.  Julie Claridge…………………………………………………………………6

        2.  Helen Marsh…………………………………………………………………...7

ARGUMENT…………………………………………………………………………...7

    I.   Standards For Determining Whether To Certify A Class Pursuant To Rule 23…………..7

    II.  The Proposed Class Satisfies The Rule 23(a) Factors…………………………………..8

        A.  The Proposed Class Is Sufficiently Numerous…………………………………..8

        B.  Whether NAPG Charged A Rate That Was Higher Than A Market Based Variable
            Rate Based On The Specified Factors Is A Fact Common To The Proposed Class…..8

        C.  Plaintiffs' Claims Are Typical Of Those Of The Class…………………………...11

        D.  Plaintiffs Will Adequately Represent The Class…………………………………12

    III. The Proposed Class Meets The Rule 23(b)(3) Factors…………………………………13

        A.  Common Questions of Law or Fact Predominate Because The Elements Of
            The Class's Claims Can Be Resolved By Means Of Classwide Proof………………13

            1.  The Proposed Class's New York General Business
                Law § 349 and § 349-d Claims Can be Adjudicated Using Common Proof…….14

a.   Plaintiffs Will Prove That Defendant Represented To Each
Member Of The Class That It Would Charge A Market Based Variable
Rate That Reflected Market Commodity Prices Using Common Proof……..15

b.   Plaintiffs Will Prove That Defendant's Representation That
It Would Charge a Market Based Variable Rate Was False Using
Common Proof………………………………………………………………16

c.   Plaintiffs Will Establish Class Damages Using Common Proof……………19

2.   The Proposed Class's Contract Claims
Can be Adjudicated Using Common Proof…………………………………...22

3.   The Proposed Class's Duty of Good Faith
And Fair Dealing Claims Can be Adjudicated Using Common Proof…………. 23

B.   A Class Action Is The Superior Method Of Adjudicating The Controversy………..24

IV. The Proposed Class is Easily Ascertainable……………………………………..25

CONCLUSION…………………………………………………………………..25

## **TABLE OF AUTHORITIES**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*
  98 N.Y.2d 144 (2002)……………………………………………………………………23

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds,*
  133 S.Ct. 1184 (2013)..................................................................................8, 13

*Civic Ass'n of the Deaf v. Giuliani,*
  915 F. Supp. 622 (S.D.N.Y. 1996) ................................................................. 9

*Comcast v. Behrend,*
  133 S. Ct. 1426 (2013)................................................................................... 19

*Consol. Rail Corp. v. Hyde Park,*
  47 F.3d 473 (2d Cir. 1995).............................................................................. 8

*Dalton v. Educ. Testing Serv.,*
  87 N.Y.2d 384 (1995)..................................................................................... 23

*Dalton v. Lee Publications, Inc.*, No.,
  2013 WL 5887872 (S.D. Cal. Oct. 31, 2013) ............................................... 22

*Dupler v. Costco Wholesale Corp.,*
  249 F.R.D. 29 (E.D.N.Y. 2008) .................................................................... 10

*Ebarle v. Lifelock, Inc.,*
  2016 WL 234364 (N.D. Cal. Jan. 20, 2016) ................................................. 11

*Ebin v. Kangadis Food Inc.,*
  297 F.R.D. 561 (S.D.N.Y. 2014)..............................................................10, 25

*Ebin v. Kangadis Food Inc.,*
  2013 WL 3936193 (S.D.N.Y. July 26, 2013) ............................................... 20

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S. Ct. 2179 (2011).................................................................................... 8

*Flanagan v. Allstate Ins. Co.,*
  242 F.R.D. 421 (N.D. Ill. 2007) ................................................................... 10

*Fogarazzao v. Lehman Bros., Inc.,*
  232 F.R.D. 176 (S.D.N.Y. 2005)................................................................... 11

*Ge Dandong v. Pinnacle Performance Ltd.,*
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)..................................................................... 24

*Gorat v. Capala Bros., Inc.,*
  2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) ...................................................................... 25

*Gulf Oil Co. v. Barnard,*
  452 U.S. 89, 101 S. Ct. 2193 (1981) .................................................................................. 7

*Hahn v. Massage Envy Franchising, LLC,*
  2014 WL 5099373 (S.D. Cal. Apr. 15, 2014) ................................................................... 11

*In re Cablevision Consumer Litig.,*
  2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014) ................................................................... 23

*In re Checking Account Overdraft Litig.,*
  281 F.R.D. 667 (S.D. Fla. 2012) ...................................................................................... 24

*In re Drexel Burnham Lambert Grp., Inc.,*
  960 F.2d 285 (2d Cir. 1992)............................................................................................. 12

*In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.,*
  209 F.R.D. 323 (S.D.N.Y. 2002)...................................................................................... 25

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
  169 F.R.D. 493 (S.D.N.Y. 1996)...................................................................................... 22

*In re Nassau County Strip Search Cases,*
  461 F.3d 219 (2d Cir. 2006)............................................................................................... 7

*In re Polaroid ERISA Litig.,*
  240 F.R.D. 65 (S.D.N.Y. 2006)........................................................................................ 11

*In re Scotts EZ Seed Litig.,*
  304 F.R.D. 397 (S.D.N.Y. 2015)........................................................................ 10, 12, 24, 25

*In re U.S. Foodservice Inc. Pricing Litig.,*
  729 F.3d 108 (2d Cir. 2013).................................................................................. 10, 21, 25

*Initial Pub. Offerings Sec. Litig.,*
  471 F.3d 24 (2d Cir. 2006)............................................................................................... 25

*Jermyn v. Best Buy Stores, L.P.,*
  276 F.R.D. 167 (S.D.N.Y. 2011)...................................................................................... 10

*Lazaroff v. Paraco Gas Corp.*,
   38 Misc. 3d 1217(A), 967 N.Y.S.2d 867 (Sup. Ct. 2011) ...................................................... 20

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013)............................................................................................... 22

*Macaluso v. U.S. Life. Ins. Co.*,
   2004 WL 1497606 (S.D.N.Y. July 2, 2004) ......................................................................... 22

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)................................................................................................. 7

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)............................................................................................... 13

*Morris v. Alle Processing Corp.*,
   2013 WL 1880919 (E.D.N.Y. 2013) ..................................................................................... 8

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993).................................................................................................. 11

*Rodriguez v. It's Just Lunch, Intern.*
   300 F.R.D. 125 (S.D.N.Y. 2014)...........................................................................................9, 10

*Seekamp v. It's Huge, Inc.*,
   2012 WL 860364 (N.D.N.Y. Mar. 13, 2012)......................................................................... 23

*Seijas v. Republic of Argentina*,
   606 F.3d 53 (2d Cir. 2010)................................................................................................... 24

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
   293 F.R.D. 287 (E.D.N.Y. 2013) ......................................................................................... 21

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003)................................................................................................... 22

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009)...................................................................................................15, 22

*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................................................... 22

*Sykes v. Mel S. Harris and Associates LLC*,
   780 F.3d 70 (2d Cir. 2015)....................................................................................................9, 12, 19

*Vu v. Diversified Collection Servs., Inc.,*
  293 F.R.D. 343 (E.D.N.Y. 2013) ......................................................................... 11

*Yang Chen v. Hiko Energy, LLC,*
  2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ....................................................... 19

**Statutes**

N.Y. G.B.L. § 349-d .............................................................................. 9, 14, 15, 19

N.Y. G.B.L. § 349 ...................................................................................... 14, 15, 19

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ passim

## INTRODUCTION

Plaintiffs Julie Claridge and Helen Marsh bring claims on their own behalf and the following class comprised of: All New York North American Power & Gas, LLC customers who paid North American Power & Gas, LLC's variable rate.[1]

The Court will likely encounter few cases that are as ripe for class certification as the one at bar.  Plaintiffs' claims, like those of each member of the proposed class, arise from alleged misrepresentations regarding North American Power & Gas, LLC's ("NAPG") variable market based rate in the uniform "Welcome Packet" each prospective customer receives before entering into an agreement to buy electricity from NAPG.  That Welcome Packet contains a uniformly used Sales Agreement which represents to customers that NAPG's "variable market based rate" would be based on "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges."  Any reasonable consumer would understand from this representation that NAPG's variable rate does in fact reflect market prices and changes in wholesale commodity (i.e. electricity) costs.[2]  However, such a consumer would be wrong; NAPG charges a rate that is in fact much higher than it would have been had NAPG charged a true market variable rate based

---

[1] Excluded from the Class is Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

[2] In fact, William Kinneary, NAPG's President, testified that the Sales Agreement means that the "commodity, transportation, balancing fees, storage charges, North American Power fees, [and] profit" factors should all reflect market prices.  *See* April 7, 2016 Deposition of William Kinneary ("April 7 Dep.," relevant portions of which are attached as Exhibit 2 to the Declaration of D. Greg Blankinship ("Blankinship Dec.")) at 39:21-40:19.

on the specified factors.  Not only is the misrepresentation uniform, but the directly resulting

injury to the class is also uniform because when NAPG sets its rate, it uses one standard variable

rate for all of its customers within a particular utility region.

The proposed class is manageable because common proof will be used to prove both

liability and damages.  NAPG maintains business records that identify each class member, when

they were on the variable rate and what that rate was, and how much electricity they were sold

(in kilowatt hours ("KwH")).  Using NAPG's business records and publicly available utility and

electricity rate data, Plaintiff's expert, Dr. Frank A. Felder, can and has constructed a damages

model that identifies how much each class members' damages are when NAPG's rates are

compared to utility rates and a rate that NAPG would have charged had it complied with the

terms of the Sales Agreement.  Thus, every class member's claims arise from the same course of

conduct (NAPG's deceptive representation that it charges a market variable rate when it does

not), and both liability and damages can be determined using common proof, namely NAPG's

business records and publicly available data.

Plaintiffs therefore respectfully request that the Court certify the proposed class and

appoint Plaintiffs and their counsel to represent the class in this litigation.

## <u>COMMON FACTS</u>

A.  <u>NAPG Sells Retail Electricity To New York Consumers.</u>

In 1996, the electric utility industry within the State of New York was restructured.

Among the goals of the reorganization were increased competition and deregulation within the

industry, with an eye towards achieving greater consumer choice and an overall reduction of

energy rates.  As a result, the State's electric industry is open to competition, and consumers may

choose their supplier of electricity.  The new energy suppliers, who compete against local

utilities such as Con Edison, are known as Energy Services Companies, or "ESCOs."  While ESCOs supply the power, the delivery of electricity to homes remains the job of the local utilities.  *See* Expert Report of Frank A. Felder (the "Felder Report" is attached as Exhibit 1 to the Blankinship Dec.) at 3.  NAPG first began selling electricity to New York customers in or around June 2011.  *See* April 7 Dep. at 19:1-7.

**B.      All NAPG Customers Receive**
**The Same Disclosures Regarding NAPG's Variable Rate.**

During the class period, NAPG acquired its New York customers through a few different marketing channels (e.g. direct mail and internet marketing).  *See* April 7 Dep. at 19:8-20:19. NAPG acknowledges that it "works hard" to ensure that its marketing message is consistent across the various marketing channels used in New York.  *Id*. at 23:4-10.  To that end, regardless of the marketing channel through which a customer learns of NAPG's services, all customers have to sign up with NAPG through its website or by calling NAPG directly, which ensures that all class members receive the same disclosures.  *Id*. at 20:20-21:3.  Moreover, every new NAPG customer receives the same "Welcome Packet," which includes a "Welcome Letter" and "Sales Agreement" that form the basis of the contract between the customer and NAPG, including disclosures regarding the rate NAPG customers will be charged for electricity.  *Id*. at 21:9-23:3. A sample of the Welcome letter and Terms and Conditions provided to New York customers is attached as Exhibit 4 to the Blankinship Dec.  NAPG acknowledges that it expects that its customers will read the information provided to them in this Welcome Packet, which includes a disclosure that the customer can rescind his or her decision to switch to NAPG within a specified period of time.  *Id*. at 21:9-23:3.  In other words, customers are provided the materials in the Welcome Packet so that they may consider the uniform information NAPG provides regarding the rate they will be charged for electricity before committing to the Sales Agreement.

NAPG customers receive electricity based on NAPG's variable rate one of two ways. NAPG sometimes offered customers a "promotional rate" which was a guaranteed rate for one or two months, after which they would be switched to the "variable rate." *Id.* at 23:11-21. NAPG also offers a "fixed-rate" product; after the fixed-rate period expires, customers who did not sign up for a new fixed-rate period are switched to NAPG's month-to-month variable rate. *Id.* at 47:14-23, 54:8-55:2.

Regardless of whether a customer chooses a variable rate product or a fixed rate product, NAPG's uniform Sales Agreement represents that the variable rate is based on the same factors and set in the same manner. April 7 Dep. at 49:20-50:5. These factors and the way NAPG sets its variable rate have remained the same throughout the entire time it sold electricity in New York. *Id* at 53:8-15. *See, e.g.,* NAPG-Clar-000018-25, attached as Exhibit 4 to the Blankinship Dec., at NAPG-Clar-000021.

The process by which NAPG sets its rates has not materially change during the entire time NAPG has sold electricity in New York. NAPG first forecasts how much electricity is needed to meet its customers demand in the upcoming month. April 7 Dep. at 67:18-68:10. Then, NAPG employs a hedging strategy by which it buys electricity in advance of the month either as a swap or by buying electricity futures.[3] *Id.* NAPG then purchases electricity in the short term or spot market to make up for the difference in what it purchased in advance versus what was actually used by its New York customers. *Id.* at 68:20-70:20. By purchasing its electricity in this manner, NAPG admits that its variable rates for a given month may not be

---

[3] An electricity swap or derivative purchase allows NAPG to pay a fixed price for the coming months' electricity irrespective of changes in the wholesale commodity price during that month. April 7 Dep. at 72:2-13 (Exhibit 2); February 24, 2015 Deposition of William Kinneary ("February 24 Dep.," relevant portions of which are attached as Exhibit 3 to the Blankinship Dec.) at 95:9-7. An electricity future is an agreement to buy or sell electricity at a fixed price but to be delivered and paid for at a later date. February 24 Dep. at 197:13-25.

consistent with the current market price for electricity.  *Id.* at 72:2-73:17.

Within the New York market, NAPG supplies electricity to customers that are serviced by the following local electricity utilities: Central Hudson Gas & Electric, Con Edison, National Grid, Niagara Mohawk Power, New York State Electric, Orange & Rockland, Rochester Gas & Electric.  *Id* at 12:23-14:8.  All variable rate customers within a given utility region are charged the exact same variable rate for any given month, except that NAPG sets a different variable rate for two zones serviced by Con Edison.  *Id.* at 79:3-9, 99:7-16.

**C.     NAPG Maintains Accurate And Reliable Data That Identifies Class Members And The Rates They Were Charged.**

NAPG uses record-keeping software and databases to store all information about putative class members and the rates they were charged in any month.  The database that stores all customer information is called "Informed Power."  *See* February 24 Dep. at 35:2-36:13.  The system used to calculate each customer's bills and that functions as an "electronic data interchange" with the utilities is called "Revenue Manager."  *Id.*  All information contained in Informed Power and Revenue Manager is linked to unique account numbers assigned to every NAPG customer.  *Id.*  Information stored in the Informed Power and Revenue Manager databases include the Customer's name and address; whether the customer is on a promotional, fixed or variable rate plan in any particular month; the rate charged to the customer for each month; the total kilowatt hours of electricity used; and the local utility that services that customer.  *Id.* at 39:11-46:20; *see also* March 17, 2016 Deposition of William Kinneary ("March 17 Dep.," relevant portions of which are attached as Exhibit 5 to the Blankinship Dec.) at 13:5-16, 27:21-25, 33:20-24, 115:13-15.  NAPG has confirmed that the information contained in Informed Power and Revenue Manager is reliable, accurate, and that NAPG maintains and relies upon the business records in Informed Power and Revenue Manager in the regular course of its

business.  April 7 Dep. at 11:7-12:9.

NAPG also maintains information regarding its monthly expenses and costs it uses to determine what rate it will charge customers in each utility market for electricity in a given month as well as its historical variable rates.  This information is maintained in the form of invoices, swap confirmations and spreadsheets which have been produced in discovery.  NAPG has confirmed that the information contained in these documents and spreadsheets is reliable, accurate, and that NAPG relies upon them in the regular course of its business.  February 24 Dep. at 62:12-24; March 17 Dep. at 16:6-21; April 7 Dep. at 96:17-98:1.

**D.**       **Plaintiffs' Claims Are Typical Of Class Members' Claims.**

       **1.**       **Julie Claridge**

As with all NAPG customers, Ms. Claridge was presented with a Welcome Packet after she expressed an interest in NAPG's electricity service.  Blankinship Dec. ¶ 5.  The Welcome Letter and the Sales Agreement were typical of the letters and agreements provided every other NAPG customer.  *See* April 7 Dep. at 34:12-21, 43:10-15, 51:14-53:15; *see also* NAPG-Clar-000018-25, attached as Exhibit 4 to the Blankinship Dec..

After Ms. Claridge's fixed rate expired, NAPG charged Ms. Claridge $0.1599 per kilowatt hour for the billing period beginning April 15, 2014, almost three times the fixed rate. Complaint ¶ 21.  From January 2014 until April 2014 (during which time Ms. Claridge was an NAPG customer), the price per kilowatt hour that NAPG charged went up from $0.05490 per kilowatt hour to $0.1599 per kilowatt hour, an increase of almost 300%.  Complaint ¶ 22.   At no time during this period did NAPG charge less than $0.05490 per kilowatt hour.  *Id.*  In contrast, the price that National Grid charged in January 2014 was $0.07285 per kilowatt hour, and it was

only $0.06024 per kilowatt hour in April 2014.  Complaint ¶ 25.  In other words, while the local

utility managed to lower electricity rates, NAPG's rate more than doubled.  *Id.*

      **2.**     **Helen Marsh**

      NAPG provided Ms. Marsh with a Welcome Letter and Sales Agreement almost identical

to those provided Ms. Claridge.  *See* NAPG-Clar-000001-8, attached as Exhibit 6 to the

Blankinship Dec.  After Ms. Marsh's fixed rate expired, NAPG charged Plaintiff $0.1574 per

kilowatt hour, more than double the fixed rate.  Complaint ¶ 30.  From January 2014 to January

2015 (during which time Ms. Marsh was an NAPG customer), the price per kilowatt hour that

NAPG charged went up from $0.06990 per kilowatt hour to $0.1739 per kilowatt hour, an

increase of over 200%.  *Id.* at ¶ 31.  In contrast, the price that Central Hudson charged in January

2014 was $0.06402 per kilowatt hour, and it was only $0.07983 per kilowatt hour in January

2015.  *Id.* at ¶ 32.  In other words, while the local utility managed to lower electricity rates,

NAPG's more than doubled.  *Id.*

## ARGUMENT

**I.**     **Standards For Determining Whether To Certify A Class Pursuant To Rule 23.**

      The Supreme Court has recognized that "[c]lass actions serve an important function in

our system of civil justice."  *Gulf Oil Co. v. Barnard*, 452 U.S. 89, 99, 101 S. Ct. 2193 (1981).

Because class actions provide a single forum in which to litigate the same or similar claims, a

class action affords an indispensable mechanism for the conservation of judicial resources.  *See*

*In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006).  Any doubt as to the

propriety of certification should be resolved in favor of certifying the class because denying class

certification will almost certainly terminate the action and be detrimental to the class members.

*See Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (Rule 23 should be "given liberal

rather than restrictive construction.").  Indeed, "[c]ourts in this Circuit have displayed 'a preference for granting rather than denying class certification." *Morris v. Alle Processing Corp.*, No. 08-4874, 2013 WL 1880919, at *5 (E.D.N.Y. 2013) (certifying class).

In determining whether a class should be certified, the question is not whether plaintiff will prevail on the merits, but whether the requirements of Rule 23 have been established by a preponderance of the evidence.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011).  "Merits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S.Ct. 1184, 1195 (2013).  "[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision." *Id.* (internal citations omitted).

## II.     The Proposed Class Satisfies The Rule 23(a) Factors.

### A.     The Proposed Class Is Sufficiently Numerous.

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable."  Numerosity is satisfied if the proposed class consists of forty or more members.  *See Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Here, there are tens of thousands of Class members.  *See* Felder Report at 12.  Thus, numerosity is met.

### B.     Whether NAPG Charged A Rate That Was Higher Than A Market Based Variable Rate Based On The Specified Factors Is A Fact Common To The Proposed Class.

As the Supreme Court held in *Dukes*, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  Thus, commonality "is satisfied if there

is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'  Consideration of this requirement obligates a district court to determine whether plaintiffs have 'suffered the same injury.'"  *Sykes v. Mel S. Harris and Associates LLC,* 780 F.3d 70, 84 (2d Cir. 2015) (affirming order granting motion for class certification and quoting *Dukes*, 131 S.Ct. at 2551).  "Commonality does not mandate that all class members make identical claims and arguments."  *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996) (certifying class).  Indeed, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement."  *Dukes*, 131 S. Ct. at 2562.

Commonality is easily satisfied here.  Indeed, there are at least three common questions, the determination of which are outcome determinative of every class members' claim.  <u>First</u>, common to every class members' claim is whether NAPG represented that its variable rate would be based on and reflective of wholesale market prices.  <u>Second</u>, common to every class members' claim is whether NAPG's variable rate was based on and reflective of wholesale market rates and the factors specified in the Sales Agreements or whether NAPG's rates were in fact higher than they would have been if NAPG had based its rates on the specified factors. <u>Third</u>, common to the class is a determination of the proper amount of damages: either the difference between what NAPG charged or what customers would have paid had they been utility customers, or the difference between NAPG's rate and a true market rate based on the specified factors.  A related common question is whether each such customer should be awarded the $500 statutory damages under N.Y. G.B.L. § 349-d.

*Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125 (S.D.N.Y. 2014), is instructive. There, the court certified a nationwide class related to those who paid for services and who

claimed to have been enticed to do so by means of corporate-mandated misrepresentations. *Id.* at

136. The court concluded that "plaintiffs have demonstrated that a 'common question' exists as

to whether defendants materially misrepresented their services to the members of the proposed

national class." *Id.* Indeed, courts routinely find commonality has been met in cases involving

allegedly false or deceptive representations. *See, e.g., Jermyn v. Best Buy Stores*, *L.P.*, 276

F.R.D. 167, 172-73 (S.D.N.Y. 2011) (denying motion to decertify based on *Dukes*).[4]

>      As the Second Circuit recently held:

> We have previously observed that fraud claims based on uniform
> misrepresentations to all members of a class are appropriate subjects for class
> certification because, unlike fraud claims in which there are material variations in
> the misrepresentations made to each class member, uniform misrepresentations
> create no need for a series of mini-trials. Here . . . plaintiffs allege that . . .
> invoices . . . included the same fraudulent misrepresentation . . . While each
> invoice obviously concerned different bills of goods with different mark-ups, the
> material misrepresentation—concealment of the fact of a mark-up inserted by the
> VASP—was the same in each.

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (affirming

certification of RICO and breach of contract claims). Similarly here, NAPG concealed from

consumers the fact that its rates were higher than a market based variable rate, which it

uniformly promised to charge. Plaintiffs meet Rule 23(a)(2)'s commonality requirement.

---

[4] *See also Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) (certifying GBL 349 and breach of contract claim and holding that an "overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment.") (listing cases); *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 428 (N.D. Ill. 2007) ("Claims arising out of form contracts are particularly appropriate for class action treatment . . . Additionally, our courts have often found a common nucleus of operative facts when the defendants are, as here, alleged to have directed standardized conduct toward the putative class members.") (internal citations omitted); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (finding commonality satisfied where all injuries derive from alleged misrepresentations made by defendant); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (finding commonality satisfied where liability is premised on whether a claim is false and/or misleading).

## C.    <u>Plaintiffs' Claims Are Typical Of Those Of The Class.</u>

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class. Fed. R. Civ. P. 23(a)(3). "The typicality requirement is not demanding." *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (granting motion for class certification; citation omitted). Typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (reversing denial of class certification).

Typicality is readily satisfied in cases like this, where all class members were victims of the same misconduct (NAPG's deceptive representations and false promises regarding its variable rate), and they suffered the same injury (paying a rate that was higher than they would have paid had NAPG not misrepresented the basis of its variable rate). Opinions holding that typicality is readily satisfied where the plaintiff was injured by the same false and deceptive representations and omissions are legion. *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 76 (S.D.N.Y. 2006) (certifying class and holding that "Defendants' argument that Plaintiffs' claims for misrepresentation and nondisclosure inherently require an individualized analysis is also insufficient to defeat typicality. The Complaint contains allegations of plan-wide misrepresentations and nondisclosures which, by definition, were not individualized.").[5]

---

[5] *See also Ebarle v. Lifelock, Inc.*, No. 15-00258, 2016 WL 234364, at *4 (N.D. Cal. Jan. 20, 2016) (certifying class where "[l]ike the rest of the proposed settlement Class Members, [the plaintiffs] purchased the Defendant's products and services that were advertised, marketed, and sold as providing "comprehensive" monitoring services . . . the named Plaintiffs' claims arise from Defendant's common practices and alleged misrepresentations and thus are typical of the Class Members."); *Hahn v. Massage Envy Franchising, LLC*, No. 12-153, 2014 WL 5099373, at *13 (S.D. Cal. Apr. 15, 2014) (finding the plaintiff's claims typical and certifying class where "all class members, including Plaintiffs, entered into form membership agreements which provided that prepaid massage services would expire upon cancellation or when a membership fell into arrears."). A finding of typicality is especially appropriate where, as here, the allegedly improper communications are made in uniform written letters and notices which were received by the named plaintiff. *See Vu v. Diversified Collection Servs., Inc.*, 293 F.R.D. 343, 354 (E.D.N.Y. 2013)

Plaintiffs' claims are typical of the class they seek to represent.

**D.      Plaintiffs Will Adequately Represent The Class.**

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).  "Under Rule 23(a)(4) of the Federal Rules of Civil Procedure, adequacy is satisfied unless plaintiff's interests are antagonistic to the interest of other members of the class." *Sykes*, 780 F.3d at 90 (citation omitted).  "Class representatives must have a sufficient interest in the outcome of the case to ensure vigorous advocacy." *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 406 (citation omitted).  "Plaintiffs must also have attorneys who are 'qualified, experienced, and generally able to conduct the litigation.'" *Id.* (citing *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d 285, 291 (2d Cir. 1992)).

Here, the named Plaintiffs have responded to written discovery requests, they have produced documents relating to their claims in this litigation and they will each sit for depositions.  Blankinship Dec. ¶ 9.  Nor is there any basis to contend that the interests of the named Plaintiffs are antagonistic to the class.  As such, Plaintiffs are more than adequate class representatives.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. at 406-07 ("Lead plaintiffs have each demonstrated their commitment to pursuing these claims by responding to extensive written discovery requests and sitting for lengthy depositions.  Further, each lead plaintiff testified he or she understands the requirements of serving as lead plaintiff, and wishes to move forward. Finally, nothing in the record suggests lead plaintiffs' interests are antagonistic to those of other class members.").

Plaintiffs' counsel are also qualified to represent the class.  In fact, Finkelstein,

---

(certifying class and finding typicality satisfied where "Plaintiff's claims could not be more similar to those of the class because both are based on near; identical language in the notice letters.").

Blankinship, Frei-Pearson & Garber, LLP ("FBFG"), Mazie Slater Katz & Freeman, LLC

("MSKF) and McCuneWright, LLP ("MW") are at the forefront of class action litigation

concerning ESCOs deceptive practice, having successfully resolved the first such class action in

New York (*Wise v. Energy Plus Holdings, LLC*, No. 11-7345, Dkt. No. 74 (S.D.N.Y. Sept. 17,

2013)), and reaching a settlement (preliminarily approved) with another ESCO (*Chen v. HIKO

Energy, LLC*, No. 14-1771, Dkt. No. 73 (S.D.N.Y. Jan. 6, 2016)).  Plaintiffs' counsel is also

currently litigating additional cases against NAPG (*see Fritz v. North American Power & Gas,

LLC*, No. 14-634, Dkt. No. 42 (D. Ct. Jan. 29, 2015) (denying motion to dismiss New Jersey

state law claims).  FBFG, MSKF and MW have also been appointed class counsel in numerous

consumer class actions, including cases in this Court.  Blankinship Dec. Exhibit 7, Mendelsohn

Dec. ¶¶5-6, and Schelkopf Exhibit A.

**III.    The Proposed Class Meets The Rule 23(b)(3) Factors.**

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to

class members predominate over any questions affecting only individual members," and "a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).  Both requirements are met here.

**A.    Common Questions of Law or Fact Predominate Because The Elements
Of The Class's Claims Can Be Resolved By Means Of Classwide Proof.**

Rule 23(b)(3) requires only "a showing that questions common to the class predominate,

not that those questions will be answered, on the merits, in favor of the class."  *Amgen*, 133 S.

Ct. at 1191 (emphasis in original).  "Class-wide issues predominate if resolution of some of the

legal or factual questions that qualify each class member's case as a genuine controversy can be

achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252

(2d Cir. 2002).

In this action, the legal and factual issues do not require individualized determinations because all of the elements of Plaintiffs' and the proposed class's claims can be adjudicated using a common set of proofs. The question of whether the Welcome Packets and Sales Agreements were deceptive, and the related question of how NAPG was obligated to set its variable rate under the terms of the Sales Agreement, will largely be determined by the trier of fact based on the documents themselves. Whether Plaintiffs and the proposed class have been damaged can be adjudicated using common proof, to wit, NAPG's business records, which contain customer account information identifying each class member, the period of time each class member paid NAPG for electricity based on its variable rate, what that rate was, and how much electricity each class member used each month. NAPG also maintains business records reflecting exactly how much it paid for the wholesale electricity NAPG sold its retail customers and all the associated costs it considered when it set its variable rate. Using NAPG's business records, and comparing it to publicly available data regarding utility rates, Plaintiffs' expert, Frank A. Felder, can identify the damages each class member suffered as a direct result of Defendant's failure to charge a market based variable rate based on the specified factors. And of course, damages directly resulting from Defendant's deceptive conduct can be easily assessed because each class member will receive the $500 statutory penalty provided by N.Y. G.B.L. §349-d. Thus, individual issues will not predominate over common issues because Defendant's liability and class damages can be determined using common proof.

### 1. The Proposed Class's New York General Business Law § 349 and § 349-d Claims Can be Adjudicated Using Common Proof.

Plaintiffs' New York General Business Law § 349 ("Section 349") and § 349-d ("Section 349-d") claims are well-suited to class treatment. Section 349 prohibits "deceptive acts or

practices in the conduct of any business, trade or commerce" and Section 349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."  The elements of a Section 349 claim are that: (1) the act or practice was consumer-oriented;[6] (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  A finding that an ESCO has violated Section 349 is synonymous with a finding that is has violated Section 349-d.  Memorandum and Order, dated September 2, 2015 (Dkt. No. 28) at 7-10.

> **a.      Plaintiffs Will Prove That Defendant Represented To Each Member Of The Class That It Would Charge A Market Based Variable Rate That Reflected Market Commodity Prices Using Common Proof.**

Plaintiffs will demonstrate that NAPG represented that its variable rate was market based and reflective of wholesale commodity prices using common proof, to wit, Defendant's Welcome Packets.  Each Welcome Packet contains a Sales Agreement, and each Sales Agreement contains a disclosure that, with minor variations, describes the variable rate as "variable market based rates  . . . include any market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose such charges."  NAPG-Clar-000018-25 (Blankinship Dec. Exhibit 4) at NAPG-Clar-000021.[7]  A jury can conclude based on the documents themselves that a reasonable consumer would expect that a variable market rate based on this disclosure would in fact be reflective of

---

[6]  There can be no dispute that NAPG's marketing practices with respect to retail residential electricity is consumer oriented.

[7]  NAPG's President agreed that any minor differences in the variable rate disclosures are inconsequential.  April 7 Dep. at 52:8-53:15 (disclosures were "substantially the same").

changes in market prices.

    **b.**    **Plaintiffs Will Prove That Defendant's Representation That It Would Charge a Market Based Variable Rate Was False Using Common Proof.**

Plaintiff will also demonstrate using common proof that NAPG's rate representation is false and misleading because NAPG's rate is not just based on market prices and wholesale power costs.  <u>First</u>, NAPG's President conceded that NAPG's variable rate is artificially high because NAPG increases its variable rate for reasons not driven by market forces or the factors disclosed in the Sales Agreement.  Most egregiously, NAPG tries to encourage its customers to call NAPG and sign up for a fixed rate, and it does that by substantially raising the variable rate so customers notice the high rate and call seeking a lower fixed rate.[8]  Of course, NAPG does not disclose that it artificially raises the rate above what market costs would justify for its own purpose of driving an increase in fixed rate customers.  Moreover, and in direct contradiction to its promise to charge market rates, NAPG insulates itself from the risks associated with the vagaries of weather and unexpected usage patterns by building in an additional percentage increase under what NAPG euphemistically calls "swap slop risk" and "scheduling risk."  April 7 Dep. at 102:8-104:7, 117:13-118:22.  NAPG does not disclose the fact that its rates are artificially high because it is unwilling to suffer a loss owing to changes in the market price caused by weather or unexpected usage.  NAPG also pays a fee to British Petroleum, who actually purchases wholesale electricity on NAPG's behalf because NAPG lacks the creditworthiness to do so on its own, and NAPG directly passes this cost on to its variable rate

---

[8] NAPG has confirmed that its variable rates are always higher than the fixed rate.  April 7 Dep. at 129:15-130:3; *see also* March 17 Dep. at 102:17-103:24.  In fact, NAPG admits that it purposely and artificially raises the variable rate "to induce the customer to call back and seek a fixed price." March 17 Dep. at 103:5-7; *see also* April 7 Dep. at 129:19-130:1 ("[W]e will have the variable rate to be higher [than the fixed rate] so the customer's incentive is to go back on to a fixed rate").  Often that variable rate is not only higher than the fixed rate, but in fact, "substantially higher."  March 17 Dep. at 103:21-24.

customers.  April 7 Dep. at 78:10-12.  NAPG does not disclose that it does so.

Second, Plaintiffs' expert will demonstrate that NAPG's variable rate is not market based and reflective of changes in wholesale market prices by showing that NAPG's rate is higher than it would have been had NAPG charged a true market rate.  Dr. Felder will do so in several ways, the first being a comparison with utility rates.  The rates that New York utilities charge are in fact reflective of market rates because utilities buy electricity on the daily spot market from the same wholesale markets that ESCOs purchase electricity from.  Felder Report at 17.  NAPG agrees that the rates utilities charge are reflective of market rates in New York.  April 7 Dep. at 66:18-23.  Therefore, using common proof (rates that New York utilities charge), Dr. Felder can demonstrate that the rates NAPG charges are not in fact reflective of market rates because they are substantially higher than utility rates, even when accounting for NAPG's profit.  Felder Report at 9, Tables 8 and 9, Exhibit A.  In fact, Dr. Felder has prepared a table identifying the rates NAPG charged compared to the rates that the utilities charged during that same period.[9]

Dr. Felder can also demonstrate that NAPG's rates are higher than a true market rate based on two methods of arriving at a true market price.  The first method assumes that the manner in which NAPG bought wholesale electricity (using its various hedging strategies to buy future electricity at a fixed price) comports with the Sales Agreement.  NAPG maintains pricing spreadsheets that identify the exact costs it incurred to purchase electricity for its customers (its costs of goods sold or "COGS").  Dr. Felder's analysis initially assumes that all other costs listed are legitimate, and he adds a reasonable profit margin of between 1% and 5%.  The result is the

---

[9]  NAPG's Sales Agreement discloses that it does factor in a profit when calculating what rate to charge its variable rate customer.  *See* NAPG-Clar-000018-25 (Blankinship Dec. Exhibit 4) at NAPG-Clar-000021.  What that profit rate should have been is a question for the trier of fact; Dr. Felder can assist the trier of fact in assessing damages based on whatever profit margin it finds appropriate.  Dr. Felder has demonstrated that ability by calculating what NAPG's rate would have been had it charged the same rate as the utility but with a profit margin of between 1% and 5%. Felder Report, Table 8 and Exhibit A.

rate NAPG should have charged assuming the COGS it incurs is consistent with the Sales Agreement and assuming that NAPG charged a reasonable profit margin.  Dr. Felder also isolates the two additional charges a jury could reasonably conclude is not authorized by the Sales Agreement, the British Petroleum charge and Swap/Slop risk.  This analysis demonstrates that NAPG's price was consistently higher than a proper market variable rate.  *See* Felder Report Exhibit A, Table 8.

Dr. Felder can also show what NAPG's rate would have been had it purchased electricity from actual wholesale markets that reflect changes in market commodity prices, namely the daily or spot market.  A jury could reasonably conclude that NAPG's representation that its variable rate is based on changes to wholesale market prices means that it should have been purchasing electricity on the wholesale market, that is, the daily spot market rather than using hedging strategies that actually insulate NAPG from changes in market prices.  Using publicly available data, Dr. Felder can calculate what NAPG's rate would have been had its cost of goods sold been based on purchases in the spot or daily market and assuming NAPG charged a reasonable profit margin.  Felder Report at 17-18, Table 9.  This analysis demonstrates that for the vast majority of months, NAPG's price was higher than a proper market variable rate.

Third, Plaintiff can prove that NAPG's rates do not reflect changes in wholesale rates with reference to NAPG's records (showing what rate NAPG charged) and publicly available information regarding utility rates.  As noted above, the rates utilities charge are reflective of changes in wholesale market commodity prices because utilities buy electricity daily on the spot market at the then-market price.  Thus, utility rates track changes in wholesale market prices.  Felder Report (Blankinship Dec. Exhibit 1) at 17.  Plaintiffs can identify significant periods where utility rates (or commodity prices) declined but NAPG's rates increased.  For example,

from September 2014 to December 2014, Con Edison's Zone I rate declined from $0.0778 per KwH to $0.0686 (a 12% decline) while at the same time NAPG's rate rose from $0.15599 to $0.1899 (an increase of 16%. *See* Felder Report, Exhibit A.

     **c.**     **Plaintiffs Will Establish Class Damages Using Common Proof.**

Plaintiffs can establish the class's damages in a way that is consistent with Plaintiffs' theory of liability and *Comcast v. Behrend,* 133 S. Ct. 1426 (2013). Plaintiffs' N.Y. G.B.L. § 349-d theory is that NAPG deceptively represented that its market based variable rate would be reflective of the factors specified in the Sales Agreement when NAPG does not in fact charge a market rate based on changes in wholesale costs. Complaint ¶¶ 20-26, 29-41. As noted above, common proof can be used to determine whether NAPG does in fact charge a market based variable rate reflective of the factors specified in the Sales Agreement or whether it charges a higher rate, thus injuring consumers.

First, under Section 349-d, any consumer injured by a deceptive practices is entitled to minimum statutory damages in the amount of $500. Those damages are directly tied to NAPG's deceptive conduct and Plaintiffs' theory of liability. *See Sykes*, 780 F.3d at 87 ("It is not disputed that statutory damages under GBL § 349 can be assessed on the basis of common proof, as they are capped at $50. N.Y. Gen. Bus. L. § 349(h).").

Second, the measure of the proposed class's damages can be the difference between what NAPG customers paid versus what they would have paid had they purchased electricity from the utility. *See Yang Chen v. Hiko Energy, LLC*, No. 14-1771, 2014 WL 7389011, at *5 (S.D.N.Y. Dec. 29, 2014) (denying motion to dismiss Section 349 claim and holding that "plaintiffs also allege they would not have switched from [the utility] had defendant not deceived them . . . Under this theory, plaintiffs' loss would be the difference between the amount defendant charged

them and the amount they would have been charged by [the utility]").  Using NAPG's business

records, and publicly available information concerning NAPG's rates, Dr. Felder can calculate

how much each class member was overcharged compared to the utility rate.  Dr. Felder's Exhibit

A shows the difference between NAPG's rates and the relevant utility rate; Tables 3-6 are

examples of class members' damages calculations; and Table 8 calculates class damages for each

utility region.

Third, the measure of damages might also be the benefit of the bargain Plaintiffs and

members of the proposed class believed they were entering into, namely a market variable rate

based on the factors specified in the Sales Agreement.  *See Lazaroff v. Paraco Gas Corp.*, 38

Misc. 3d 1217(A), 967 N.Y.S.2d 867 (Sup. Ct. 2011), *aff'd*, 95 A.D.3d 1080, 945 N.Y.S.2d 326

(2012) (denying motion to dismiss where "Plaintiff alleges that . . . he and the purported

members of the class paid a higher price per gallon/pound of propane and failed to receive what

was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of

propane he was promised. Thus, plaintiff has properly alleged injury.").[10]

Using NAPG's business records and publicly available information, Dr. Felder can

determine what NAPG's rates should have been under the Sales Agreement by assuming that

NAPG's hedging strategy was consistent with the Sales Agreement but backing out such charges

as British Petroleum's fee, the Swap/Slop risk adjustments, and by adding in a reasonable profit

margin.[11]  Exhibit A shows the difference between NAPG's rates and the proper market rate

assuming the validity of NAPG's hedging strategy; Tables 3-6 are examples of class members'

---

[10] *See also Ebin v. Kangadis Food Inc.*, No. 13-2311, 2013 WL 3936193, at *3 (S.D.N.Y. July 26, 2013) ("[On] plaintiffs' . . . NYGBL . . . claim[], the proper measure of damages is the benefit of the bargain.").

[11] Should the jury determine that NAPG was authorized to pass the British Petroleum cost and the Swap/Slop risk on to its customers, Dr. Felder can easily recalculate class damages by not subtracting those costs from NAPG's COGS.

damages calculations from each of the six utilities whose customers can also choose NAPG; and Table 8 calculates class damages for each utility region.  Dr. Felder can also determine what NAPG's rates would have been if a jury determines that the Sales Agreement requires that NAPG buy electricity on the wholesale spot market.  Exhibit A shows the difference between NAPG's rates and the proper market rate had NAPG actually purchased electricity at wholesale market rates (which is the same as the utility rates); Tables 3-6 are examples of class members' damages calculations; and Table 9 calculates class damages for each utility region.

Thus, predominance is satisfied.  As the Second Circuit noted, in "*Comcast,* the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 123 (affirming certification).  Here, Plaintiffs' proposed damages methodology is directly tied to the basis of Defendant's liability, either because class members are owed $500 in statutory damages, or because Dr. Felder can isolate the exact amount of overcharge based on the undisclosed factors NAPG uses when setting its rates and its failure to charge a market rate.  As such, Plaintiffs' proposed class easily satisfies *Comcast*.

Moreover, Plaintiffs will prove both liability and damages using a set of common proofs, namely NAPG's business records and publicly available utility information, and therefore individual hearings will not be required.   Decisions finding that individual issues will not predominate litigation where computerized records can be used to determine liability and damages are numerous.  *See, e.g., Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 306 (E.D.N.Y. 2013) ("'Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective

criteria, thus rendering unnecessary an evidentiary hearing on each claim.'  Here, the individual

factual determinations that must be made, including the amount of interest to which each

claimant is entitled, can be made by reference to records and objective criteria, and the

predominance requirement is satisfied.") (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d

32, 40 (1st Cir. 2003) (reversing decertification)).[12]

### 2.    The Proposed Class's Contract Claims Can be Adjudicated Using Common Proof.

Plaintiffs' breach of contract claim is also well-suited to class treatment.  Under New

York law, a claim for breach of contract requires proof of: "(1) a valid contract; (2) plaintiff's

performance; (3) defendant's failure to perform; and (4) damages resulting from the breach."

*Macaluso v. U.S. Life. Ins. Co.*, 2004 WL 1497606, at *3 (S.D.N.Y. July 2, 2004) (citation

omitted).  The Second Circuit observed that "breach of contract claims certainly can be

appropriate for class treatment, but only where they are subject to generalized proof."  *Spagnola*,

574 F.3d at 98.  "In particular, actions that involve form or uniform contracts have been

recognized as being well-suited for treatment as a class action."  *Id.* (citing *Steinberg v.*

*Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from

interpretations of a form contract appear to present the classic case for treatment as a class action

. . .")).

Here, common proof can be used to adjudicate the proposed class's claims.  Plaintiffs

---

[12] *See also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 522 (S.D.N.Y. 1996)
(certifying class where "[b]ased on the Defendants' own records, a jury may reasonably estimate
damages."); *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (Defendant's
"computerized payroll and time-keeping database would enable the court to accurately calculate
damages and related penalties for each claim ... [so that] damages could feasibly and efficiently be
calculated once the common liability questions are adjudicated."); *Dalton v. Lee Publications, Inc.*,
No. 08-1072, 2013 WL 5887872, at *2 (S.D. Cal. Oct. 31, 2013) (certifying class where "proof of
both liability *and* damages will be based on Defendants' records and publically available
information. Thus, the danger the Supreme Court observed in *Comcast* that plaintiffs "did not isolate
damages resulting from any one theory of [liability]," is not present in this class action.").

allege that the Sales Agreement obliges NAPG to set its variable rate based on market prices and the factors specified.  Plaintiffs' allege that NAPG breached the Sales Agreement by charging a rate higher than the rate authorized under the contract, and they can prove that claim, as described above, using NAPG's business records and publicly available information.  Thus, common issues will predominate over individual issues when adjudicating Plaintiffs' and the proposed class's breach of contract claims.  Not surprisingly, courts routinely certify breach of contract claims where the defendant's advertisements and contracts are uniform.  *See, e.g., In re Cablevision Consumer Litig.*, No. 10-4992, 2014 WL 1330546, at *10 (E.D.N.Y. Mar. 31, 2014) (finding predominance in plaintiffs' breach of contract actions because each class member was bound by the same standard form contract that obligated defendant to provide a "*uniform* pro rata credit of monthly subscriber fees" for service disruptions).[13]

### 3. The Proposed Class's Duty of Good Faith And Fair Dealing Claims Can be Adjudicated Using Common Proof.

The court should certify Plaintiffs' breach of the covenant of good faith and fair dealing claim.  In New York, all contracts contain an implied covenant of good faith and fair dealing, under which "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

Here, Plaintiffs allege that NAPG violates the breach of the duty of good faith and fair dealing by using its discretion to charge extraordinarily high rates under the guise of "profit" and

---

[13] *See also Seekamp v. It's Huge, Inc.*, No. 09-00018, 2012 WL 860364, at *11 (N.D.N.Y. Mar. 13, 2012) (certifying breach of contract claim under New York law where "the ATSD is a standard form contract, the interpretation of which will not require individualized inquiries as to each contract signed by each proposed class member.").

its misguided attempt to push variable rate customers onto fixed rates.  Complaint ¶¶ 69-72.

Good faith and fair dealing claims can be certified where "class-wide evidence of a defendant's

subjective bad faith or objective unreasonable conduct" exists.  *See In re Checking Account*

*Overdraft Litig.*, 281 F.R.D. 667, 681 (S.D. Fla. 2012); *Ge Dandong v. Pinnacle Performance*

*Ltd.*, No. 10-8086, 2013 WL 5658790, at *12 (S.D.N.Y. Oct. 17, 2013).  As discussed above, Dr.

Felder can reliably calculate the rate NAPG customers would have paid if they were a utility

customer as well as what a true market-based variable price would have been had NAPG not

abused its discretion by reaping unreasonable profits and by basing its rates on factors not

identified in the Sales Agreement.

**B.      A Class Action Is The Superior Method Of Adjudicating The Controversy.**

Rule 23(b)(3) requires a class action to be "superior to other available methods for fairly

and effectively adjudicating the controversy."  The Court must consider:  (A) the class members'

interests in individually controlling the prosecution or defense of separate actions; (B) the extent

and nature of any litigation concerning the controversy already begun by or against class

members; (C) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P.

23(b)(3).

Here, each of the factors weighs in favor of certification.  <u>First</u>, each class member's

interest in bringing their own cases is negligible if not economically irrational, given that filing

fees and other litigation costs, not to mention attorneys' fees, would quickly outstrip any

potential recovery.  When, as here, "proceeding individually would be prohibitive for class

members with small claims . . . the class action device is frequently superior to individual

actions."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 415 (quoting *Seijas v. Republic of Argentina*,

606 F.3d 53, 58 (2d Cir. 2010)).  Second, Plaintiffs are unaware of any other litigation concerning class members' claims.  Third, there will be no difficulties in managing the class given that the identification of class members with claims, and their respective statutory and actual damages, can be easily determined by reference to Defendant's records and publically available information.  *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130-31.

## IV.  The Proposed Class is Easily Ascertainable.

Though it does not appear in the text of Rule 23, courts in this circuit have recognized an "implied requirement of ascertainability."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 407 (citing *Ebin v. Kangadis Food, Inc.*, 2014 WL 737960, at *4 (S.D.N.Y. Feb. 25, 2014)). Ascertainability turns on the definition of the proposed class.  *See Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006.  The class must be "identifiable" such that "its members can be ascertained by reference to objective criteria."  *In re Methyl Tertiary Buyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). "The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'"  *Ebin*, 2014 WL 737960, at *5 (quoting *Gorat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010)).  The proposed class is imminently ascertainable; indeed, North American Power maintains a database called "Informed Power" that identifies all customers who were on the variable rate with NAPG and when.[14]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court certify the above-identified class and appoint Plaintiffs and their counsel as Class Representatives and Class Counsel respectively.

---

[14] *See* April 7 Dep. at 14:9-15:10 ("Using the Informed Power database," NAPG can "ascertain the identification of all of its New York electricity customers," "the particular months during which each of those customers was enrolled in North American Power" and "the specific variable rate that each one of those customers paid for the ones that are on the variable rate").

DATED:  April 22, 2016

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

By: */s/ D. Greg Blankinship*
    D. Greg Blankinship
    1311 Mamaroneck Avenue, Suite 220
    White Plains, New York 10605
    Tel: (914) 298-3281
    gblankinship@fbfglaw.com

    Matthew D. Schelkopf
    Joseph B. Kenney (*pro hac vice*
    forthcoming)
    **McCuneWright LLP**
    1055 Westlakes Drive, Suite 300
    Berwyn, PA 19312
    Tel: (610) 200-0581
    MDS@mccunewright.com
    JBK@mccunewright.com

    Matthew R. Mendelsohn
    **Mazie Slater Katz & Freeman, LLC**
    103 Eisenhower Parkway
    Roseland, New Jersey 07068
    Tel: (973) 228-9898
    mmendelsohn@mskf.net