## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE CLARIDGE and HELEN MARSH,<br><br>                    Plaintiffs,<br><br>v.<br><br>NORTH AMERICAN POWER & GAS, LLC,<br><br>                    Defendant. | Case No:  15-cv-1261-PKC |

---

**MEMORANDUM OF LAW OF DEFENDANT NORTH AMERICAN POWER & GAS, LLC IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

GORDON & REES LLP
*Attorneys for North American Power & Gas, LLC*
1 Battery Park Plaza, 28th Floor
New York, NY 10004
Phone: (973) 549-2500
Fax: (973) 377-1911
E-Mail: psiachos@gordonrees.com

Of Counsel and on the Brief:
   Peter G. Siachos, Esq.
   JoAnna M. Doherty, Esq.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 4

LEGAL STANDARD ...................................................................................................... 10

LEGAL ARGUMENT ..................................................................................................... 10

POINT I

    PLAINTIFFS CANNOT ESTABLISH COMMONALITY, AS THEIR
    CLAIMS TURN UPON SUBSTANTIAL ISSUES REQUIRING
    PROOF UNIQUE TO EACH CLASS MEMBER ..................................................... 11

POINT II

    PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THOSE OF THE
    PURPORTED CLASS ............................................................................................... 14

POINT III

    PLAINTIFFS ARE NOT ADEQUATE REPRESENTATIVES OF THE
    PURPORTED CLASS ............................................................................................... 17

POINT IV

    COMMON ISSUES, IF ANY, DO NOT PREDOMINATE ..................................... 18

        A.   The Breach of Contract Claim Fails to Satisfy the
            Predominance Requirement ............................................................................ 19

        B.   Plaintiffs' Breach of the Implied Covenant of Good Faith and
            Fair Dealing Claim Cannot Be Adjudicated Using Common
            Proof ............................................................................................................... 20

        C.   Plaintiffs' N.Y. Gen. Bus. L. §§ 349 and 349-d Claims Fail to
            Meet Rule 23(b)(3)'s Predominance Requirement ....................................... 22

        D.   Class Treatment Is Inferior To Other Methods of Adjudication .................. 23

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases:**                                                                **Page:**

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ................................................................. 10, 19

*Baron v. Pfizer, Inc.,*
   840 N.Y.S.2d 445 (3d Dep't 2007) ..................................................... 22

*Bildstein v. MasterCard Int'l,*
   329 F. Supp. 2d 410 (S.D.N.Y. 2004) .................................................. 22

*Ge Dandong v. Pinnacle Performance Ltd.*
   2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ......................................... 21

*Havell Capital Enhanced Mun. Income Fund, L.P. v Citibank, N.A.,*
   84 AD3d 588 (1st Dept. 2011) .......................................................... 21

*In re Cablevision Consumer Litig.,*
   2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014) ........................................ 19

*In re Checking Account Overdraft Litig.,*
   281 F.R.D. 667 (S.D. Fla. 2012) ...................................................... 21

*In re Currency Conversion Fee Antitrust Litig.,*
   230 F.R.D. 303 (S.D.N.Y. 2004) ...................................................... 19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
   574 F.3d 29 (2d Cir. 2009) ............................................................ 15

*In re Initial Pub. Offering Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006) ............................................................ 19

*In re U.S. Foodservice Inc. Pricing* Litig.,
   729 F.3d 108 (2d Cir. 2013) ........................................................... 14

*Jermyn v. Best Buy Stores, L.P.,*
   276 F.R.D. 167 (S.D.N.Y. 2011) ...................................................... 14

*In re Visa Check/Master Money Antitrust Litig.,*
   280 F.3d 124 (2d Cir. 2001) ........................................................... 19

*In re Vivendi Universal, S.A.,*
   242 F.R.D. 76 (S.D.N.Y. 2007) ....................................................... 24

*Marisol A. Forbes v. Giuliani,*
   126 F.3d 372 (2d Cir. 1997) ........................................................... 15

*Murphy v. American Home Products Corp.*,
   58 NY2d 293 (1983) ............................................................................................ 21

*National Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.*,
   25 AD3d 309 (1st Dept. 2006) ............................................................................ 21

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) .......................................................................................... 22

*Rodriguez v. It's Just Lunch, Intern.*,
   300 F.R.D. 125 (S.D.N.Y. 2014) ....................................................................... 13

*Servedio v. State Farm Ins. Co.*,
   889 F. Supp. 2d 450 (E.D.N.Y. 2012) ............................................................... 22

*Sokoloff v. Town Sports Int'l*,
   778 N.Y.S.2d 9 (1st Dep't 2004) ....................................................................... 22

*Solomon v. Bell Atl. Corp.*,
   777 N.Y.S.2d 50 (App. Div. 2004) .................................................................... 22

*Spagnola v. Chubb Corp.*,
   574 F.3d 64 (2d Cir. 2009) ................................................................................ 22

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
   374 F.3d 158 (2d Cir. 2004) .............................................................................. 21

*Statler v. Dell*, Inc.,
   775 F. Supp. 2d 474 (E.D.N.Y. 2011) ............................................................... 18

*Sykes v. Mel S. Harris & Assoc., LLC*,
   780 F.3d 70 (2d Cir. 2015) ................................................................................ 11

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ................................................................................ 1, 10

**Rules, Statutes, and Secondary Sources:**                         **Page:**

Fed. R. Civ. P. 23(b)(3) .................................................................................... 10, 19

Fed. R. Civ. P. 23(a) ........................................................................................... 1, 10

*Moore's Federal* Practice 23.45 (2d ed. 1985) ...................................................... 24

N.Y. G.B.L. §§ 349 and 349-d ............................................................................. 3, 15

**PRELIMINARY STATEMENT**

Defendant North American Power & Gas, LLC ("NAPG") respectfully submits this brief in opposition to the motion for class certification of Plaintiffs Julie Claridge ("Claridge") and Helen Marsh ("Marsh") (collectively, "Plaintiffs"). Plaintiffs cannot overcome or disguise the fact that their claims, which hinge on unique variables specific to each Plaintiff and member of the purported class, are manifestly unsuitable for class treatment and would require the Court to labor through thousands of fact-specific mini-trials.  Simply put, Plaintiffs cannot satisfy either the rigorous numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a) or the even more exacting predominance and superiority requirements of Fed. R. Civ. P. 23(b).

Plaintiffs cannot establish commonality because they fail to show that the members of the large purported class had the same understanding of the terms at the heart of this litigation ("wholesale market prices"), had the same sales and service experience, or even suffered the same alleged injury, as Plaintiffs or even each other. In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the Supreme Court emphasized that class certification depends not on the raising of common <u>questions</u>, but rather on whether conducting class-wide litigation will provide common <u>answers</u>. The three allegedly "common" questions raised by Plaintiffs – (1) "whether NAPG represented that its variable rate would be based on and reflective of "wholesale market prices"; (2) whether NAPG's variable rate was based on and reflective of wholesale market rates and the factors specified in the Sales Agreements"; and (3) whether and to what extent a universal damage calculation can be determined – are not sufficient to obtain class certification because Plaintiffs cannot explain how answers to such questions will definitively provide common relief to the class.  Where, as here, conduct is inherently fact-specific, there is an insurmountable gap between proving instances of misconduct, on one hand, and universal injury, on the other.  *Id*. at 2545.  Plaintiffs utterly fail to demonstrate that they suffered the same injury as members of the class or even as each other, and cannot demonstrate that NAPG handled even their accounts in a sufficiently similar manner.

Material differences in the salient facts allegedly supporting Plaintiff's claims, NAPG's alleged

wrongs, and the alleged resulting injuries create the need for individualized inquiries also do not support a finding of typicality. To adjudicate Plaintiffs' claims on a classwide basis, the Court would be forced to conduct mini-trials for allegedly thousands of NAPG customers whose claims and circumstances vary wildly – a highly inefficient process that would tend to benefit only Plaintiffs' counsel. As discovery thus far has shown, among other things, that the claims of Plaintiffs differ greatly, with both each other and the putative class. For example:

- Over a six-month period, the rates Claridge paid for electricity through NAPG were less than local utilities; Marsh's rates over the same period were approximately 4.6¢/kWh more than those of local utilities. *See* Kinneary Decl. ¶¶ 14-19.

- Claridge claims she relied on representations in a written agreement (*see* Siachos Declaration dated April 13, 2016 ("Siachos Decl."), **Exhibit A**, Transcript of Deposition of Claridge dated May 5, 2016 ("Claridge Dep."), pp. 37:22, 142:1-4 (They told me how they would calculate my rates, based on the document")); Marsh claims she relied on representations made by a representative of NAPG by phone and does not believe she received an agreement (*see* Siachos Decl., **Exhibit B**, Transcript of Deposition of Marsh dated May 6, 2016 ("Marsh Dep."), p. 87:2).

- Claridge sought to renew her initial fixed rate at a slightly higher fixed rate following the expiration of the first, whereas Marsh simply failed to renew her initial fixed rate and was automatically placed on a variable rate. *See* Claridge Dep., p. 13:5-10; Marsh Dep., p. 73:4-9. Further differentiating the womens' positions, Marsh turned down NAPG's offer for an initial twelve-month fixed rate, acceptance of which likely would have rendered her an inadequate class representative, whereas Claridge was never given an opportunity for such an extended locked rate. *See* Marsh Dep., p. 56:15-19.

- Claridge's claims concern a customer service issue in that, according to Claridge, NAPG could not manage to get her on the correct plan. *See* Claridge Dep., p. 13:5-16. Marsh's claims focus on NAPG's alleged failure to send her a renewal notice. *See* Marsh Dep., p. 73:4-9. Marsh claims it was unconscionable that NAPG placed her into a variable rate plan without her authorization. *Id.*, p. 75:5-6.

- Claridge and Marsh were charged different fixed and variable rates for electricity.

- Plaintiffs lived in different parts of New York that experienced different weather, different electricity consumption rates, and were serviced by different local utilities. *See* Claridge Dep., p. 19:8 33:13-15; Marsh Dep., pp. 18:20, 28.

- Claridge and Marsh define the term "wholesale market price" differently. In fact, Claridge had no preconceived notion of the definition of "market rates" or "wholesale market price" prior to this suit. *See* Claridge Dep., p. 41:1-3. Marsh, on the other hand, claims she understood energy market rates, and claims that NAPG promised on the telephone that her rates would be based on "daily market rates." *See* Marsh Dep., p. 12:6-25. When confronted with recordings of her calls with NAPG – which utterly belie the claim that her variable rate would be based on "daily market rates" – she steadfastly stuck by her claim. *See* Siachos Decl., **Exhibit C**, Transcript of Marsh Phone Calls with

NAPG ("Marsh Calls"), p. 24; *see also* Siachos Decl., **Exhibit D**, Transcript of Claridge Phone Calls with NAPG.

- Claridge paid every bill, subjecting her and claims like hers to waiver, voluntary payment doctrine, and accord and satisfaction defenses, some of which defenses might be dispositive of her claims; Marsh did not pay her bills, so such defenses may not be available to her claims and those like them. *See* Claridge Dep., p. 109:5-6; Marsh Dep., p. 43:16-17.

- Claridge did not ask for any refunds or reimbursements from NAPG while on a variable rate; Marsh asked for a refund and NAPG sent her a check in the amount of $126. *See* Siachos Decl., **Exhibit E**. Though Marsh did not cash the check, many class members received and negotiated refund checks. *See* Kinneary Decl., ¶ 17. Those members who did will be subject to a defense of accord and satisfaction, while others will not.

- NAPG made different promises to Claridge and Marsh, and Plaintiffs allegedly suffered different injuries. It would be difficult to administer their claims on a consolidated basis, but it will be impossible to adjudicate potentially thousands of divergent class claims contingent upon myriad variables unique to each customer.

- Claridge was not certain whether she was being charged a variable or fixed rate in her last three billing cycles – a fact that cuts decisively against a finding of adequacy. *See* Claridge Dep., p. 121:18-20.

- Many consumers will contend that the terms and conditions of their agreement with NAPG are clear and unambiguous. These consumers paid the price they expected to pay for their electricity, and they took advantage of NAPG's offer to provide a fixed rate as part of their continuing service. These consumers recognized (like Claridge, and unlike Marsh) that it was their obligation to be aware of the end date of each fixed-rate period, and to sign up for another fixed-rate period so that they could continue doing business with NAPG. *See* Siachos Decl., **Exhibit F**, Declarations of current NAPG customers.

These examples not only demonstrate that Plaintiffs' claims are disparate, but also highlight the scores of variations of facts and claims that would persist if a class is certified.

Moreover, G.B.L. § 349's three-year statute of limitations renders the class representatives inadequate to represent any member of the class, which Plaintiffs claim dates back to 2009, who was allegedly injured prior to November 20, 2014. Moreover, even if Plaintiffs' deceptive business practices claims did not violate the applicable statute of limitations, NAPG did not even begin doing business in the state of New York until 2011. *See* Siachos Decl., **Exhibit G**, Transcript of Deposition of William Kinneary dated April 7, 2016 ("Marsh Dep."), p. 19:7.

Finally, even if Plaintiffs could satisfy the Rule 23(a) requirements, they cannot establish by a preponderance of evidence that common claims, if any, predominate over those that are rampantly

individualized, or that a class action is the superior means of adjudicating Plaintiffs' and the class members' claims. For these reasons, and as set forth more fully below, NAPG submits that Plaintiffs have not established the requirements of Rule 23 by clear and convincing evidence, and, as such, the Court should deny Plaintiffs' motion for class certification.

## FACTUAL BACKGROUND

### NAPG's Marketing Strategy in New York

NAPG began marketing electricity to New York customers in June or July of 2011. *See* Kinneary Dep., p. 19:7. NAPG's marketing strategy initially focused on direct mailing efforts, word of mouth advertising, telemarketing, and direct sale networking groups (current customers were given an incentive to solicit their friends, relatives, neighbors, and acquaintances to purchase electricity from NAPG). *Id*. Over the years, NAPG's marketing plan has been expanded to include passive vendor websites like ChooseEnergy.com, banner ads, and other user-sensitive, internet advertising. *Id.*, pp. 20:8-9, 30:22. The sales and service experience of each NAPG customer is uniquely different from that of any other customer in light of several factors that impact the fixed or variable rate for electricity NAPG may offer to that customer, including, but not limited to transportation fees, the utility price for electricity, balancing fees, storage fees, profit and line losses, taxes, and the like. *See* Siachos Decl., **Exhibit H**, Claridge Sales Agreement; **Exhibit I**, Marsh Sales Agreement. Such variables are disclosed to all New York consumers as part of the sales process, and are highly fact-sensitive, a fact conceded by Claridge when she testified that NAPG "told [her] how they would calculate their rates." *See* Claridge Dep., p. 142:1-4. In addition to subjective variables, each customer's understanding of his/her variable rate agreement, most specifically with regard to pricing based upon market factors, may turn heavily on his or her unique definition of the term and fact-specific sales experience with NAPG.

### NAPG's Different Rate Plans

Monthly rates charged by local utilities are not reflective of the market rate during a given month. *See* Kinneary Decl. ¶ 6. Rather, the rate charged by a local utility reflects a number of factors, including past wholesale market rates, and do not reflect real time rates on the open market. *Id*. Utility

default rates in New York have nothing to do with market costs, because they are set in advance of market costs being known. *Id*. ¶ 11. These prices simply do not reflect actual short-term, monthly market costs, and any contention that utility default prices in New York are based on "wholesale prices," "wholesale rates," or "daily market rates" would be false. *Id*. The cost to a local utility for energy could be, and often is, the current cost of energy averaged with the price of prior months and the prior year. *Id*. ¶ 12. A trend analysis of the long term average of a local utility's individual monthly rates may demonstrate an approximation of the market rate when averaged over a long period of time, but current utility rates simply do not reflect the current cost of energy to that utility. *Id*. Utilities can purchase energy months in advance through hedging. *Id*. ¶ 13. Policies on hedging and reconciling over and under collections will vary from utility to utility, as no two utilities conduct business in precisely the same manner. Since utilities conduct their business in varying manners, their costs will vary. *Id*.

NAPG is not a local utility. *Id*. ¶ 23. Among other things, NAPG has a different number of customers and total demand than most local utilities, and has different amounts of cash reserves, and it has different contracts for the purchase of energy. *Id*. Local utilities are positioned to spread short-term fluctuations in energy costs out over a longer period of time, insulating themselves and their consumers from short-term price fluctuations. *Id*. NAPG's profits are not dependent on the cost of its commodity purchase in a single region, and cannot be determined on an individual or monthly basis. *Id*. ¶ 24. Many factors go into calculating NAPG's profit, including NAPG's operating costs, including but not limited to billing, accounting, finance, legal, regulatory, customer service, collections, and marketing costs. Calculating NAPG's profit based solely on the cost of commodity purchase in a specific region completely ignores these costs and ignores the fact that NAPG is not a local utility. *Id*.

NAPG does not typically expect negative margins in winter months, but with swings in temperature, such as with the polar vortex in the Winter of 2013-2014, and the resultant high record-breaking sustained wholesale costs in New York State, NAPG suffered significant losses in that winter. *Id*. ¶ 14. Accordingly, NAPG maintained a higher rate in the following months to recoup severe losses it sustained from the previous months during the exceptionally cold winter.

Over the somewhat extended period, NAPG's rates were certainly based on its wholesale energy and business operating costs. *Id.*

NAPG offers a wide range of variable and fixed rates for electricity to its customers in New York. These rates are calculated based upon several fluid variables, some of which are disclosed to each customer at the point of sale, and others that are subjectively unique to the customer. NAPG's variable rates are further distinguished between network-marketed customers (*i.e.* those that became NAPG customers through direct advertising and marketing efforts of NAPG) and non-network marketed customers (*i.e.* those that became NAPG customers through direct sale networking groups). *See* Kinneary Dep. p. 79:17-23.

All customers are offered an initial fixed rate that varies in length. *Id.*, pp. 46:18, 49:1-3. Following their initial rate, some customers choose to allow their rate automatically to renew on a month-to-month variable rate following the initial fixed period, others choose to sign up for a new fixed rate period, still others are offered a "step-up" variable rate that matures over time, and still others choose to cease doing business with NAPG. *Id.,* p. 46:13. In 2014, when rates for electricity in New York spiked dramatically, NAPG took short term losses in order to soften the blow to its variable rate customers and, over time, gradually raised its rates to reflect the realities of New York's volatile utility market. *Id.* Currently, approximately 56% of NAPG's customers are on a fixed rate, and 44% of customers are on some form of variable rate for electricity. *Id.*, p. 135:11-13.

Variable rates further diverge depending upon the zone in which a customer resides. New York is made up of eleven utility zones, in which there are, in some cases, multiple pricing levels, depending on the utility that services a particular zone. *Id.*, p. 98:19-21. In these zones and "sub-zones," electricity rates vary, sometimes drastically, based upon unique conditions unique to those markets. *Id.*, p. 99. No two customers are alike, as they have numerous power service options open to them. Some may choose to convert from a variable rate to a fixed rate, and possibly from a fixed rate to a variable rate, perhaps several times throughout their relationship with NAPG. *Id.*, p. 96:1-9. NAPG customers are billed on a cycle determined by the utility that generates the electricity provided to each customer. As such, NAPG

customer bills could reflect the rate in an individual month, or could reflect the rate in a prior month, as some utilities base their rates on the first day of the meter read cycle, whereas others base their rates upon the last day of the meter read cycle, and still others prorate over a month-long period. *Id.*, p. 16. Additionally, while the rates of all NAPG customers absorb New York State's mandatory 25% renewable energy credit, some NAPG customers to whom sustainability and environmental consciousness are important opt to include additional renewable energy credits in their rate, which necessarily increases their total variable rate. *Id.*, p. 92:8-13.

**Claridge's Relationship with NAPG**

Claridge is a fairly sophisticated consumer who was "always looking to save," and who routinely switched energy service providers after "doing her homework" in order to get the best deal. *See* Claridge Dep., p. 48:7-9, 50:1-2. In January 2014, Claridge chose NAPG to supply electricity to her two homes in Brewerton, New York, a small town located on Oneida Lake not far from Syracuse, New York[1]. *Id.*, p. 19:14. Claridge initiated the sales call after receiving a flyer advertising NAPG's rates in the mail. *Id.*, p. 56:3. Claridge never visited NAPG's website prior to or concurrent with signing up for NAPG's services. *Id.*, p. 55:8-9. NAPG offered Claridge an initial, three-month fixed rate at 5.49¢/kWh. *Id.*, p. 76:21-25. Claridge did not opt to add green/renewable energy credits to her plan. *Id.* p. 78:21-22. NAPG's offer, which Claridge accepted over the phone, was reduced to writing in a Sales Agreement that notified Claridge that savings are not guaranteed, as the utility price for electricity may (and did) vary during the term of the Sales Agreement. *Id.*, p. 59:8-9. Claridge testified that she knew that her initial fixed rate would convert to a variable rate once her fixed rate expired. *Id.*, p. 79:3. She also testified that she was aware that savings on NAPG's plan were not guaranteed and that she knew that NAPG's variable rate would be based upon the price of electricity during any given month and a host of expressly enumerated variables, including, but not limited to, market pricing,

---

[1] The average January, February, March, and April lows in Brewerton, NY are, respectively, 16°F, 18°F, 25°F, and 37°F. Average respective highs for these months are 32°F, 34°F, 43°F, and 57°F. *See National Climatic Data Center,* NOAA 1981-2010. Weather records from Syracuse International Airport report that, in early 2014, temperatures dropped to as low as -12°F.

transportation, taxes, and the like, because it was in her agreement with NAPG. *Id.*, p. 81:13-19.

In March 2014, toward the end of her initial fixed rate term, Claridge received a renewal notice that gave her the options to: (1) extend her service by an additional three months at an increased fixed rate of 6.49¢/kWh; (2) continue with NAPG on a month-to-month variable rate; or (3) cancel service without penalty. *See* Siachos Decl., **Exhibit J**. The notice instructed Claridge to contact NAPG by April 2, 2014 in order to continue with NAPG on a fixed rate, and that if she did not do so, a second fixed rate period could take up to three months to take effect. *Id.* Claridge chose to continue with NAPG on a second fixed rate plan at 6.49¢/kWh, but neglected to notify NAPG of her decision by April 2, 2014. *See* Claridge Dep., p. 96:10-12. As such, her new fixed rate did not immediately take effect, and NAPG charged Claridge 15.99 and 13.99 cent per kWh variable rates for electricity for two billing cycles each[2]. *See* Kinneary Decl. ¶ 18. As promised in the terms of her agreement with NAPG, Claridge's variable rate was based upon several variables unique to Claridge, as well as market prices for commodity, transportation, balancing fees, storage charges, NAPG fees, profit, line losses plus applicable taxes, and other charges or fees imposed by the local utility. *See* Siachos Decl., Ex. H. Claridge complained to NAPG about her rate several times over the course of three months – including complaints that NAPG was unable to ensure that she remained on a fixed rate as they agreed to do – until she ultimately terminated her service with NAPG, without penalty[3].

**Marsh's Relationship with NAPG**

In January 2014, Marsh signed up for the provision of electricity through NAPG to her home in Poughkeepsie, New York.[4] Marsh became interested in NAPG's rates after receiving a flyer in the mail advertising fixed rates. *See* Marsh Dep., p. 16:18-23. She signed up for NAPG's services by calling

---

[2] For example, in the Apr 5, 2014 to May 8, 2014 and May 8, 2014 to Jun 6, 2014 billing cycles, Claridge was charged 15.99¢/kWh, a difference of 9.5¢ per kWh from NAPG's 6.49¢/kWh offer. In the Jun 6, 2014 to Jul 7, 2014 and Jul 7, 2014 to Aug 6, 2014 billing cycles, Claridge was charged 13.99¢/kWh, a difference of 7.5¢/kWh from NAPG's 6.49¢/kWh offer. *See* Siachos Decl., **Exhibit K**.
[3] Claridge called NAPG several times to discuss her energy bills. *See, e.g.* Claridge Dep., p. 107:7-13.
[4] The average January, February, March, and April lows and highs in Poughkeepsie, New York approximate those in Brewerton, New York. *See National Climatic Data Center,* NOAA's 1981-2010. Weather records from the area in 2014 show unseasonably high temperatures (60°F), with lows in the single digits. *Id.*

the number advertised in the NAPG flyer and speaking with an NAPG sales representative, who allegedly told Marsh that she would initially be charged a fixed rate for four months, and thereafter would be charged a variable rate that would correlate to the daily market price of electricity.  *Id.*, p. 15:17-20.  Marsh testified that she believed at the time that the term "daily market price" means "the commodity rate, the competitive rate of other electric energy sources," but she is unsure as to whether the term includes the wholesale price of electricity.  *Id.*, pp. 12:3, 14:13.

The NAPG sales representative initially offered Marsh fixed rate options, for four months at 6.49¢/kWh, or for twelve months at 7.29¢/kWh.  *Id.*, p. 59:1.  Marsh testified that she was not interested in the latter, so she chose the first option, and opted to forego renewable energy credits. *Id.,* pp. 59:1, 84:13.  NAPG's offer, which Marsh believed was "very reasonable," is contained in a sales agreement that notified Marsh that savings are not guaranteed, and that the price for electricity typically varies during even a one-month time period.  *Id.*, p. 40:10.  Marsh testified that she knew that her initial fixed rate would convert to a variable rate after four months and that she never asked NAPG to extend her fixed rate beyond the initial four months.  *See* Marsh Dep., p. 35:5.  Marsh concedes that the NAPG sales representative with whom she spoke when signing up for services never promised that rates were capped, or that NAPG would match or never exceed rates offered by Marsh's former utility provider; however, she insists that she was promised that NAPG's rates would be based on the "daily market rate" for electricity.  *Id.*, pp. 12, 63.  A review of the transcript of the call belies Marsh's contention.  In fact, the representative only stated that her future rates could not be guaranteed, and would be determined by unpredictable future factors.  *See* Marsh Call p. 14:14-25.

After Marsh's initial fixed rate expired, her service was converted to a variable rate, as Marsh did not contact NAPG to sign up for an additional fixed rate period.  *See* Marsh Dep., p. 70:6-20.  Marsh claims that she did not receive a renewal notice prior to or following the expiration of her four month fixed rate and that, if she had, she would have sought to extend NAPG's services for another fixed rate period.  *Id.*, p. 75:3-6; *but see* Siachos Decl., **Exhibit L**, a renewal notice sent by NAPG to Marsh. However, she concedes that she knew, based on her initial conversations with an NAPG salesperson,

that she automatically would be renewed at a variable rate following the expiration of her initial fixed rate if NAPG "didn't hear from [her]," and that she knew that NAPG's rates would not match the daily rates of the utilities. *See* Marsh Dep., p. 75:4. After her initial fixed rate expired, Marsh remained an NAPG customer for several months, during which time she was charged various variable market rates. *Id.*, p. 76. She knew throughout this time that she could discontinue services without penalty. *Id.*, p. 56:3. At no point did Marsh request to extend her initial fixed rate, however, she made several phone calls to NAPG in 2014-2015 seeking clarification of the computation of her variable rate and reimbursements. *See e.g.* Marsh Call.

## LEGAL STANDARD

The class action is an exception to the usual rule that litigation is conducted by named parties only. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2550. In order to justify departure from that rule, class representatives must possess the *same* interest and suffer the *same* injury as the class members. *Id*. As such, class certification is appropriate only when a plaintiff can demonstrate the initial, threshold elements required by Fed. R. Civ. P. 23(a): numerosity, common issues of fact or law, typicality, and adequacy of representation. The plaintiff additionally must prove that common issues *predominate* and that the class procedure is *superior* to other available methods (for example, those that do not provide counsel for the plaintiff with a windfall) for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) requirements are more exacting than the threshold requirements of Rule 23(a). *Amchem Products, Inc. v. Windsor*, 521 U.S. 393, 445 n.3 (2010). Moreover, unlike the "limited fund" and injunctive relief classes addressed by subsections (b)(1) and (b)(2) of Rule 23, class treatment "is not as clearly called for" where money damages are the primary remedy sought. *Id*. Certification is proper only if the trial court is satisfied, after "rigorous analysis," that Rule 23 has been satisfied." *Wal-Mart*, 131 S. Ct. at 2551. As such, Plaintiffs must "demonstrate compliance with Rule 23" and must prove that are in fact numerous parties, common questions of law or fact, etc. *Id.* at 2551.

## LEGAL ARGUMENT

NAPG respectfully submits that application of the Rule 23 standard leads to the inevitable

conclusion that Plaintiffs cannot prove that: there are *in fact* sufficiently common questions of fact or law; that their claims are *in fact* typical of those of the class; that common issues *in fact* predominate; that a class action is *in fact* a superior mode of adjudication; or even that they are *in fact* adequate representatives of the class they wish to certify.

**POINT I**

**PLAINTIFFS CANNOT ESTABLISH COMMONALITY, AS THEIR CLAIMS TURN UPON SUBSTANTIAL ISSUES REQUIRING PROOF UNIQUE TO EACH CLASS MEMBER**

Under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." This issue concerns not just the ability to raise a common question, as "any competently crafted class complaint literally raises common questions." *Wal-Mart,* 131 S. Ct. at 2551. Rather, commonality requires plaintiffs to demonstrate that the class members have suffered the same <u>injury</u>, as opposed to merely a violation of the same law. *Sykes v. Mel S. Harris & Assoc., LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (What matters to class certification is not the "raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."). While the questions Plaintiffs seek to certify on a class wide basis -- (1) "whether NAPG represented that its variable rate would be based on and reflective of wholesale market prices"; (2) whether NAPG's variable rate was based on and reflective of wholesale market rates and the factors specified in the Sales Agreements or whether NAPG's rates were in fact higher than they would have been if NAPG had based its rates on the specified factors"; and (3) whether and to what extent a universal damage calculation can be determined[5]--  may concern similar alleged violations of statutory and common law, Plaintiffs simply cannot establish that injuries allegedly arising from those alleged violations are sufficiently similar to each other, let alone to each member of the putative class.

Merely reciting so-called "common" questions is not sufficient to obtain class certification, because the questions Plaintiffs seek to certify do not "depend upon a common contention," the determination of the truth or falsity of which "will resolve an issue that is central to the validity of each

---

[5] *See* Plaintiff's Brief in Support of Motion for Class Certification ("Pl. Br."), p. 9.

one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2552. Since the fate of Plaintiffs' claims hinge on answers to questions far more specific and uniquely applicable to each class member than the general questions raised in Plaintiffs' moving papers, commonality cannot be said to exist.

Moreover, Plaintiffs' first and second so-called "common questions" concerning the extent to which NAPG promised that its variable rates would be reflective of "wholesale market rates" are not even common to Claridge and Marsh, must less to the class as a whole. Claridge, for example, testified that she does not understand the meaning of the term "wholesale rate," and has no idea if there is any difference between the terms "market rate" and "wholesale rate." *See* Claridge Dep., p. 41:7-8. Marsh, however, testified that she understood "wholesale rate" to mean the rate a utility provider, rather than the public, is charged for electricity. *See* Marsh Dep., p. 12:3. In direct contradiction to the supposed "common" class questions regarding NAPG's variable rates, Marsh further testified that she believes that NAPG's variable prices should have been determined by "daily market price," or "the commodity rate, the competitive rate of other electric energy sources" – Marsh's definition of "market value." *Id*.

In order to assess and/or answer each of Plaintiffs' three "common" questions, the Court must also embark on a cumbersome, fact-specific investigation and assessment of myriad variables that are unique to each class member, which are set forth in greater detail in NAPG's assessment of the Rule 23(a) "typicality" requirements, *infra*. In addition to these variables, the Court also must consider that no two sales experiences are identical, as evidenced by the divergent alleged representations and promises made by NAPG to Claridge and Marsh alone. Marsh, on one hand, testified that she was told by an NAPG representative that her fixed rate would not be converted to a variable rate without her authorization and that any variable rate she was charged would "be cheaper than" or "at" her understanding of "market rate." *See* Marsh Dep., pp. 38, 43. Claridge, on the other hand, testified that her understanding of the rates she was charged for electricity came from her subjective interpretation of her agreement with NAPG. *See* Claridge Dep., p. 15:17-20.

Clearly, Plaintiffs' "common questions" will not help the Court determine if Plaintiffs, let alone each of the allegedly thousands of members of the class, suffered the same injury. In fact, not even

Plaintiffs' injuries were caused by the same alleged acts. Whereas Claridge complains that she was charged a variable price when she should have been charged a second fixed price rate (a fixed rate delay), Marsh complains that NAPG did not send her a renewal notice (a customer service issue). *See, e.g.* Claridge Dep., p. 12:3; Marsh Dep., p. 74:13-15. Likewise, whereas Claridge testified that she would have been happy remaining an NAPG customer had NAPG charged her the second fixed rate it had promised, Marsh testified that she would not have been happy with any rate other than her initial four-month fixed rate, even a twelve-month rate locked at 7.29¢/kWh. *See* Claridge Dep., p. 13:8-11; Marsh Dep., p. 59:22-25.

In an effort to bolster their flawed commonality arguments, Plaintiffs cite to several inapposite cases as "instructive" on the issue. For example, Plaintiffs rely on the decision in *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125 (S.D.N.Y. 2014), wherein the plaintiffs were able to demonstrate that a common question existed as to whether the defendants materially misrepresented their services by enticing members of the class to pay for services by means of universal, mandated misrepresentations. *See* Pl. Br., p. 10. The decision in *Rodriguez*, however, hinged upon a finding that the defendant, a matchmaking service, instructed its employees to follow a uniform script in conducting intakes and to inform all prospective customers that matches existed, even if they did not, which the Court found to be *per se* illegal, and therefore deceptive as a matter of law. *See Rodriguez*, 300 F.R.D. at *132, *147. Such facts are inapplicable in the case at bar, where the weight of evidence shows that NAPG's internal salespeople follow inbound sales call guidelines that that allow for and encourages flexibility and questions that are customized to each customer's unique needs, and specifically give the operator discretion as to the description of NAPG's rates, and services. *See* Siachos Decl., **Exhibit M**[6]; *see also* Marsh Call, p. 8. Clearly, *Rodriguez* is not "instructive."

---

[6] "Ask customer for his/her zip code so you can check the offerings available in his/her area"; "*As applicable,* explain energy choice and the nature of NAP's business"; "If the customer appears reluctant to commit, probe for a reason, if appropriate, [and] listen to what the customer says and acknowledge his/her concerns"; "Explain rate plans, pricing, and *applicable* promotion based on current sales strategy"; "Advise customer that NAP prices do *not* include tax, distribution service charges, or any utility fees or charges."

Plaintiff's reliance on *Jermyn v. Best Buy Stores, L.P.* is misplaced for the same reason.   In *Jermyn*, the Court denied the defendant's motion to decertify the class on the basis that the plaintiffs had "presented significant (indeed, ample) proof that the illegal policy alleged in fact exists."  276 F.R.D. 167, 173 (S.D.N.Y. 2011).  Plaintiffs here have failed to do so, and as set forth herein, the weight of evidence would not support a finding that NAPG's corporate policies are the "threat" or "glue" tying the class members', or even the Plaintiffs', claims together.

In a similar vein, Plaintiffs' reliance on *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108 (2d Cir. 2013). to support their argument that "fraud claims based on uniform misrepresentations to all members of a class are appropriate subjects for class certification because … uniform misrepresentations create no need for a series of mini-trials."  *See* Pl. Br., p. 10.  First, Plaintiffs make no allegations of fraud, nor could they.  Moreover, Plaintiffs conveniently ignore the fact that this case does not involve affirmative deception and lies; rather, it involves the subjective and fluid definition by allegedly several thousand class members, as well as NAPG, as to the meaning of the phrase "variable market rate."  NAPG did not "conceal from consumers the fact that its rates were higher than a market based variable rate," as Plaintiffs suggest.  This argument flies in the face of the sworn testimony of both Claridge and Marsh that NAPG never guaranteed that they would save money or that NAPG's rates would be lower than or match any utility, market, or commodity rates.  *See* Claridge Dep., p. 59:8-9, 101; Marsh Dep., p. 40:10.

Based on the foregoing, it is clear that the questions Plaintiffs seek to certify on a class wide basis are far from common.  Inasmuch as classwide proceedings cannot possibly generate common answers to these questions NAPG respectfully submits that certification should be denied.

## POINT II

## PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THOSE OF THE PURPORTED CLASS

The typicality requirement of Rule 23(a)(3) is satisfied only if the "claims and defenses of the representative parties are typical of the claims and defenses of the class."  Typicality requires the claims

to be sufficiently similar so that the representatives' pursuit of their own goals will work for the benefit of the class. *Marisol A. Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). To that end, this requirement focuses on the similarity of the claims; the factual circumstances on which those theories and claims are based; and whether the proposed representatives face unique or atypical defenses. *Id*. Plaintiff's violation of N.Y. G.B.L. §§ 349 and 349-d, breach of contract, and breach of implied covenant of good faith and fair dealing claims rise and fall based upon a host of variables that make it impossible for Plaintiffs to satisfy the Rule 23 typicality requirement.

Plaintiffs cannot establish typicality because they cannot show that each class member's claim arises from the same course of events, that each class member makes similar legal arguments to prove NAPG's liability, or even that the same defense applies to every claim at issue. *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir. 2009). Plaintiffs' proposed class consists of potentially "thousands" of NAPG customers "who paid [NAPG's] variable rate," regardless of the facts and circumstances appurtenant to that decision. *See* Pl. Br., p. 1. While some class members, like Claridge, were offered an initial three month fixed rate, others, like Marsh, were offered four and twelve-month introductory fixed rates, and still others were offered one and two month introductory fixed rates. And this is just the beginning of the class members' divergence. For example, Plaintiffs would be hard-pressed to show that NAPG charges the same variable or fixed rate to *any* two people who sign up for an initial three-month term, as NAPG's fixed and variable rates are calculated based upon a complex algorithm of variables unique to each customer that considers, *inter alia*:

- The zone and/or subzone in which each customer resides;
- The type of solicitation and/or advertisement each class member received, if any;
- The time of year in which the person becomes an NAPG customer;
- Other NAPG customers' electricity usage in the same zone and/or subzone;
- Other utilities' customers' electricity usage in the same zone and/or subzone;
- Fees assessed in the customer's zone/subzone;
- Fees assessed by the utility providing electricity for a particular client;
- Weather conditions;

- ▪ Special offers, whether from NAPG or another utility provider that NAPG wishes to price-match;

- ▪ Whether the customer adds renewable "green" energy credits to his/her rate;

- ▪ The extent to which the customer is renewing an elapsed initial fixed rate;

- ▪ The customer's creditworthiness, if applicable;

- ▪ Local, national, and global news effecting the price of utilities;

- ▪ The extent to which the customer reads and/or understands the terms of his/her agreement with NAPG;

- ▪ The extent to which the customer knows he/she is being charged a fixed or variable rate for electricity;

- ▪ Whether the customer complains or received reimbursements;

- ▪ The extent to which the customer is (or is not) offered a second fixed rate; and

- ▪ The customer's unique sales and service experience.

As such, Claridge was offered an initial fixed rate of 5.49¢/kWh rate, followed by a $6.49¢/kWh fixed rate offer, and Marsh, on the other hand was offered a choice between an initial fixed rate of 6.99¢/kWh for four months or a slightly higher fixed rate for twelve months. *See* Compl., ¶¶ 21-22, 27.

The purported class may also include fixed rate customers who later convert to variable agreements, customers who choose to convert from a variable rate to a fixed rate, and customers who entered into variable rate contracts with NAPG after receiving different solicitations or advertisements than those received by any other class member. The class necessarily includes individuals who were not solicited by advertisements, via phone, and by internet. To the extent that the Court could conclude that the contracts at issue are ambiguous as a result of the highly fact-sensitive nature of NAPG's agreements with the purported class, the parol evidence necessary to resolve that ambiguity would differ significantly based upon each customer's unique sales experience. Most importantly, not even Claridge and Marsh have the same (or in Claridge's case, any) understanding of the term "variable market rate." Whereas, Claridge had no preconceived notion of the definition of "market rates" or "wholesale market price" prior to this suit, Marsh claims to have thoroughly understood the wholesale market when she contracted with NAPG. *See* Claridge Dep., p. 41:1-3; *See* Marsh Dep., p. 12:6-25.

Additionally, Plaintiffs and the class members are each potentially subject to unique defenses,

including waiver, the voluntary payment doctrine defense[7], and accord and satisfaction[8].  For example, whereas Marsh refused to pay some or all of her NAPG bills, Claridge never fell behind on her payments to NAPG.  *See* Claridge Dep., p. 109:5-6; Marsh Dep., p. 43:16-17.  This disparity, which allows NAPG to assert voluntary payment doctrine, waiver, and accord and satisfaction defenses against Claridge but not against Marsh on this issue, will necessarily manifest throughout the entire class.

Discovery thus far has made clear that notwithstanding Plaintiffs' claims of uniform scripts, which in fact are not uniform at all, and misleading marketing techniques, the experiences of Claridge and Marsh substantially differed and were unique to their own sales experiences and individual interpretation of their respective contracts with NAPG.  NAPG respectfully submits that the case will be no different for the entire class.  That is, the highly individualized nature of each putative claim will require the Court to assess potentially limitless variable combinations unique to each class member and apply different damage calculations to each individual claim.  As such, and based upon the foregoing, NAPG respectfully submits that typicality has not been and cannot be established in this case.

**POINT III**

**PLAINTIFFS ARE NOT ADEQUATE REPRESENTATIVES OF THE PURPORTED CLASS**

Under Rule 23(a)(4), Plaintiffs must show that they "will fairly and adequately protect the interests of the class."  As such, they must establish both that class counsel is capable of conducting the litigation, and that Plaintiffs' interests coincide with the interests of the putative class.  *Id.*  Although NAPG does not dispute the competence of class counsel,[9] it submits that the interests of Plaintiffs and the proposed class members they seek to represent are not substantially aligned.

First, Plaintiffs are not adequate representatives of any member of the purported class that was

---

[7] Under the voluntary payment doctrine, one who makes a payment voluntarily cannot recover it on the ground that he or she was under no legal obligation to make the payment.  *Gimbel Bros., Inc. v. Brook Shopping Ctrs.*, Inc., 499 N.Y.S.2d 435, 438 (2d Dep't 1986).

[8] Accord and satisfaction are accomplished by the promisor's tender of alternative performance in satisfaction of his original obligation and by the promisee's acceptance of such alternative performance.  *In re Elsa Designs, Ltd.*, 155 B.R. 859, 868 (Bankr. S.D.N.Y. 1993).

[9] However, NAPG reserves the right to object to the representation of a former employee, Marsh, by Finkelstein, Blankinship, Frei-Pearson & Garber, LLP.  *See* Marsh Dep., p. 21.

charged a variable rate by NAPG prior to February 20, 2012, as actions brought pursuant to N.Y. Gen. Bus. L. § 349 must be commenced within three years of the date of accrual. *Statler v. Dell*, Inc., 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011). Accrual occurs when any plaintiff is injured by the deceptive act or practice that violated the statute. *Id*. Such injury occurs when "when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief." *Id*. Accrual is not dependent upon any later date when discovery of the alleged deceptive practice is said to occur. *Id*. Here, any claims that accrued more than three years prior to February 20, 2015, the date this matter was filed, are bared by virtue of the fact that they violate the applicable statute of limitations.

Moreover, a plaintiff who does not understand the definition or scope of a term that is at the heart of a litigation cannot adequately represent the interests of a class the plaintiff seeks to certify. As set forth herein, Plaintiffs submit that at least two so-called "common questions" involve the extent to which NAPG misrepresented to Plaintiffs and the putative class that its variable rates were based upon or "reflective of wholesale market prices." *See* Pl. Br., p. 9. As set forth clearly in their sworn deposition testimony, not even Claridge and Marsh can agree on a common definition to the term "wholesale market prices." *See, e.g.* Claridge Dep., p. 41; Marsh Dep., p. 12. Worse still, Claridge testified that she did not even know if the rates in her last three invoices were variable or fixed. *See* Claridge Dep., p. 121:20. NAPG submits that class representatives like Claridge and Marsh do not even come close to adequately representing a class of potentially thousands because they do not understand even the most basic underpinnings of their claims.

## POINT IV

## COMMON ISSUES, IF ANY, DO NOT PREDOMINATE

As demonstrated above, Plaintiffs cannot show that their claims satisfy the essential, threshold elements of Rule 23(a). Accordingly, the analysis should end here and the instant motion should be denied on those grounds alone.

However, even if Plaintiffs could somehow show compliance with the rigorous requirements of

Rule 23(a), the instant motion should nevertheless be denied because they cannot show that common issues *predominate*; and that a class action is *superior* to other available methods for fairly and efficiently resolving this litigation, an even more demanding test than Rule 23(a). *See* Fed. R. Civ. P. 23(b)(3).   Predominance tests whether a class is "sufficiently cohesive to warrant adjudication by representation," a standard "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).   To satisfy this requirement, Plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), abrogated in part on other grounds, *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).   The Court must therefore determine whether Plaintiffs' claims may be established by common-classwide proof, as opposed to fact-sensitive, subjective proofs that are unique to each individual member.   *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 310 (S.D.N.Y. 2004).   NAPG submits that Plaintiffs claims cannot satisfy the former requirement.

A.      **The Breach of Contract Claim Fails to Satisfy the Predominance Requirement**

Plaintiffs submit that their breach of contract claim is "well-suited to class treatment" because "common proof" can be used to adjudicate whether NAPG breached its promise to Plaintiffs and the class members "by allegedly charging a rate higher than the rate authorized under the contract[s]." *See* Pl. Br., p. 23.   Of course, Plaintiffs base this theory of liability upon their divergent misunderstanding of market pricing.   In support of this argument, Plaintiffs rely solely on *In re Cablevision Consumer Litig.*, 2014 WL 1330546 (E.D.N.Y. Mar. 31, 2014), an unpublished decision assessing the extent to which a class of customers who did not receive Fox cable channels for a two week period could be classified. *Id.* at *10.   In *Cablevision*, the terms and conditions in the defendant cable providers' agreements with customers obligated it to provide a uniform, pro rata credit of monthly subscriber fees for the disruption of Fox channels because such channels were part of each subscriber's cable package at the time of disruption.   *Id.*   The Court found that whether the defendant breached the applicable contracts had

nothing to do with subjective expectations or the actions of each subscriber, because each subscriber was bound by the same form contract.  *Id*.

In *Cablevision*, the defendant made an unequivocal, objective promise to its subscribers that was not open to interpretation.  Each and every class member in that case expected to receive Fox channel programming, because they paid for it, but for a period of two weeks did not.  Here, by contrast, Plaintiffs and the class members do not allege that they did not receive the benefit of their bargain.  On the contrary, Claridge and Marsh both testified that they were satisfied with NAPG's services.  Rather, the crux of Plaintiffs' complaints hinge on their subjective understanding and interpretation of the meaning of "wholesale market rate," which, pursuant to NAPG's contracts with Plaintiffs and the class, was comprised of several factors, only one of which was the market price for electricity.  This term is open to interpretation.  As evidenced by Plaintiffs' sworn testimony, one customer's definition of "market rate" may vary greatly from another's because each customer's understanding is contingent upon a unique individual perspective and interpretation of statements made by NAPG in marketing materials, on telephone calls (which follow a roadmap, but are not uniformly scripted), and on the web. *See*, e.g. Claridge Dep., p.  41:1-3; Marsh Dep., p. 12:6-25. As such, adjudication of Plaintiff's breach of contract claim in one forum is vulnerable to dichotomy of decision.

Because the Court will be required to resort to parol evidence of contract formation and interpretation on an individual basis to ascertain the intent of the parties and to resolve contract claims, NAPG submits that individual issues with regard to Plaintiff's breach of contract claim predominate, and class certification on this issue is not appropriate.

**B.**     **Plaintiffs' Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Cannot Be Adjudicated Using Common Proof**

Plaintiffs argue that the Court should certify their breach of implied covenant of good faith and fair dealing claim because common proof can be used to show that NAPG allegedly "charged extraordinarily high rates under the guise of 'profit'" and "attempt[ed] to push variable rate customers onto fixed rates."  *See* Pl. Br., p. 24.   New York law implies a covenant of good faith and fair dealing in

all contracts, which "embraces a pledge that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004).  As set forth herein, neither Plaintiffs nor the class members have been deprived of electricity, the fruits of their contracts with NAPG.  *See* Claridge Dep., p. 134:17; Marsh Dep., p. 18:12.  Moreover, the implied obligation is in aid and furtherance of other terms of the agreement of the parties, and no obligation can be implied which would be inconsistent with other terms of the contractual relationship.  *Murphy v American Home Products Corp.*, 58 NY2d 293, 304 (1983); *Havell Capital Enhanced Mun. Income Fund, L.P. v Citibank, N.A.*, 84 AD3d 588, 589 (1st Dept. 2011).  In short, the covenant of good faith and fair dealing cannot be construed so broadly "as to effectively nullify other express terms of the contract, or to create independent contractual rights," such as the right for the Plaintiffs and each class member to be charged what each perceives to be a reasonable variable market rate for electricity (an individual question that predominates, at any rate).  *National Union Fire Ins. Co. of Pittsburgh, PA v Xerox Corp.*, 25 AD3d 309, 310 (1st Dept. 2006).

Moreover, Plaintiffs have failed to submit any persuasive case law in support of their position. Plaintiffs cite to two inapposite cases: *Ge Dandong v. Pinnacle Performance Ltd.* 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)*,* an unpublished Southern District of New York decision, and *In re Checking Account Overdraft Litig.,* 281 F.R.D. 667 (S.D. Fla. 2012)  a Southern District of Florida that has no precedential value in this jurisdiction.  *Ge Dandong*, the only decision that has any plausible bearing on the outcome of this motion, involves claims against a fund that allegedly defrauded investors by marketing certain investment vehicles as safe, conservative investments, when in reality it had selected risky investments, manipulated the characteristics of the investments to suffer swift and total impairment upon even modest defaults, and even bet against its own investors, so that the fund would profit if the investments did poorly.  *Id*.  Under those extreme facts involving blatant manipulation and intent to defraud, the Court found that common questions involving the defendants' fraudulent behavior predominated over individual questions involving reliance on fraudulent misrepresentations.

Based on the foregoing, NAPG submits that Plaintiffs have utterly failed to establish that common questions predominate with regard to their breach of the implied warranty of good faith and fair dealing.  As such, this issue is not appropriate for certification.

**C.**   **Plaintiffs' N.Y. Gen. Bus. L. §§ 349 and 349-d Claims Fail to Meet Rule 23(b)(3)'s Predominance Requirement**

To prevail on their Section 349 claims, Plaintiffs must prove that NAPG made misrepresentations or omissions that were likely to mislead a reasonable consumer in Plaintiffs' circumstances, and that Plaintiffs were deceived by and suffered injury as a result of those misrepresentations or omissions.  *Solomon v. Bell Atl. Corp.,* 777 N.Y.S.2d 50, 55 (App. Div. 2004). While the statute does not require proof of justifiable reliance, Plaintiffs must show that NAPG engaged in a material deceptive act or practice that caused actual harm.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995).

The types of injury that Section 349 was intended to remedy are limited. *Servedio v. State Farm Ins. Co.*, 889 F. Supp. 2d 450, 452 (E.D.N.Y. 2012).  To that end, a plaintiff's alleged injury "must be independent of the loss caused by . . . breach of contract." S*pagnola v. Chubb Corp*., 574 F.3d 64, 74 (2d Cir. 2009); *Servedio*, 889 F. Supp. 2d at 452 ("[A] Section 349 claim will not lie where the deceptive act was the only injury, and the statute does not entitle a consumer to a refund of the price of a good or service allegedly secured by deception.").  Thus, Section 349 does not entitle Plaintiffs to recover that which is additional to what they were allegedly misled to believe they were purchasing. *See e.g., Baron v. Pfizer, Inc*., 840 N.Y.S.2d 445, 448 (3d Dep't 2007) (affirming dismissal of claim seeking refund of the purchase price of drug on the ground that she would not have purchased absent deceptive practices); *Sokoloff v. Town Sports Int'l*, 778 N.Y.S.2d 9, 10 (1st Dep't 2004) ("Plaintiff does not claim any kind of loss other than payment of her membership fees"); *Bildstein v. MasterCard Int'l*, 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004) ("the claimed deception cannot itself be the only injury.").

Here, Plaintiffs do not claim that they did not receive adequate electricity service or that they did not contract for the services they received.  *See Spagnola*, 574 F.3d at 74.  In fact, Claridge testified that

she was happy with the services provided by NAPG and to that end, paid all invoices for both NAPG-serviced properties.  *See* Claridge Dep., pp. 109:6; 134:17.  Rather, Plaintiffs seek to recoup either the difference between (1) the rate they were charged by NAPG versus a rate based upon the "market price of electricity" or (2) the rate they were charged by NAPG and rates charged by their previous electricity supplier.  *See* Compl., ¶ 51.  Since these alleged damages are not "actual injuries" under Section 349, such claims are not properly certifiable as to the class.

Plaintiffs also argue that common proof will establish that NAPG made misrepresentations as to its rates for electricity in so-called "Welcome Packets" and "Sales Agreements" that were provided to Plaintiffs and all class members.  This argument is belied, however, by the overwhelming individualized, unique, fact-sensitive nature of potentially thousands of claims related to NAPG's variable rates, which predominate over the disclosures in NAPG's terms and conditions.  The outcome of Plaintiffs' N.Y. G.B.L. claims hinges not on the eight "market rate" variables set forth in the "Open Price" terms in their respective agreements with NAPG.  Rather, these claims rise and fall with, among other things, Plaintiffs' understanding the of meaning of the term "market rate"; the dissimilar representations made by NAPG sales representatives to Plaintiffs with respect to that term; the different fixed and variable rates offered to and charged by NAPG to Plaintiffs; the different representations made to Plaintiffs in follow-up calls with NAPG; and even the different injuries of which both women complain.  Stated simply, factual questions with regard to the individualized, different experiences of each class member – indeed, even as between the named Plaintiffs – in connection with NAPG's services predominate in the inquiry with respect to essential elements of Plaintiffs' Section 349 claims.

**D.**     **Class Treatment Is Inferior To Other Methods of Adjudication**

Because common issues do not predominate, the Court's analysis need not address the "superiority" requirement of Rule 23(b)(3).  Nevertheless, Plaintiffs' failure of proof with respect to the superiority element provides yet another ground upon which the Court can, and should, deny certification.  Under Rule 23(b)(3), Class treatment is appropriate if a class action is "'superior to other available methods for the fair and efficient adjudication of the controversy." In determining superiority,

a court must "forecast the procedural steps necessary to implementing the class action remedy, then consider the alternatives and make a comparison judgment evaluating the options." *See Moore's Federal* Practice 23.45, at 23-337-38 (2d ed. 1985). Rule 23 enumerates four non-exhaustive factors for determining superiority of class treatment in (b)(3) actions: (1) the interest of class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of other litigation; (3) the desirability of concentrating litigation in one forum; and (4) the difficulties likely to be encountered in the management of a class action.

Plaintiffs claim that, without a class action, class members would not have the incentive, nor could they afford, to bring individual suits. *See* Pl. Br. p. 24. This argument, however, must be rejected because Plaintiffs have failed to submit any information on the basis of which the Court could conclude that all members of the putative class will be adequately and manageably notified of this action and their right to seek exclusion. *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 107 (S.D.N.Y. 2007). Moreover, given even the Plaintiffs' diverging interests and claims, which tends to show their lack of "representativeness," as well as the clear lack of commonality in this case, NAPG submits that individual actions are preferable to one single class action. Moreover, consolidating all New York claims against NAPG in the Manhattan will require most class members, including both Plaintiffs, to travel a great distance in order to participate in this action. To attend trial, Claridge, for example, must travel almost 300 miles. Any NAPG customer who does not live in New York City could potentially be forced to incur traveling costs that would greatly outweigh any negligible recovery using the class action mechanism (which of course is designed to primarily benefit Plaintiffs and their counsel). Moreover, as a practical consideration, the administration of what Plaintiffs claim are tens of thousands of individual claims of class members whose contracts with NAPG contain different rates, terms, modes of offer and acceptance, applicable geographic location, time frames, and utility providers is unfeasible, given that the complaints of each individual class member will turn on fact-sensitive inquiries, including each members' subjective understanding of NAPG's offer, the extent to which each member desired to add services additional to those initially offered by NAPG (if at all), whether the prior payment and/or

waiver defenses are available for each class member, etc.

Finally, procedural devices exist that could reduce the disadvantages of duplicative litigation without resort to a class action, including consolidation and transfer, multidistrict treatment for coordinated discovery and pre-trial, attorney groups, and use of test cases and creative scheduling to insure a preclusive effect on other suits.  As such, and based on the foregoing, NAPG submits that it is abundantly clear that class certification is not the superior mode by which the parties should litigate the claims at issue.

## **CONCLUSION**

For the foregoing reasons, NAPG respectfully requests the Court deny Plaintiffs' Motion for Class Certification.

Dated:  May 13, 2016

GORDON & REES LLP
*Attorneys for Defendant*
*North American Power & Gas, LLC*

By:  _/s/ Peter G. Siachos_____
        Peter G. Siachos
        JoAnna M. Doherty

1 Battery Park Plaza, 28th Floor
New York, NY 10004
Phone: (973) 549-2532
psiachos@gordonrees.com