UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JULIE CLARIDGE and HELEN MARSH,

           Plaintiffs,

v.

NORTH AMERICAN POWER & GAS, LLC,

           Defendant.

Case No: 15-cv-1261-PKC

**DECLARATION OF
WILLIAM KINNEARY**

      WILLIAM KINNEARY, declares under the penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

      1.    I am over eighteen (18) years of age, have never been convicted of a crime involving moral turpitude, and am fully competent in all respects to make this Declaration. The facts stated in this Declaration are within my personal knowledge, true, and correct. I submit this declaration in opposition to the Motion for Class Certification of Plaintiffs.

      2.    I am employed by North American Power & Gas, LLP ("NAPG") as its President. I have been employed by NAPG since 2011. I have personal knowledge of the facts in this declaration, except for those based on information and belief, which I believe to be true. If called upon to testify, I could and would competently testify to their truth and accuracy.

      3.    I have over 43 of experience in the energy industry, where I have held numerous positions, ranging from utility general manager to top-level executive positions in retail marketing and electric generation companies. From 1973 to 1998, I worked with a public utility in various positions, including, but not limited to, general manager of rates and regulation. For over two years, I was employed by Keyspan Energy Services, first as its Vice President and Chief Operating

Officer, and then as its President and Chief Executive Officer. From 2001 to 2004, I was President and CEO of Total Gas and Electric, and from 2005 until 2010, I was Vice President of Marketing for Infinite Energy. I also have served as a consultant to various energy companies regarding energy deregulation and regulatory compliance issues.

4. I have served as a member of the National Energy Marketers Association's Executive Committee since 1999, including two terms as Chairman and have served as Chairman Emeritus since 2005. I currently serve on their Board of Directors.

5. I have extensively reviewed Dr. Frank Felder's expert report, dated April 22, 2016, submitted in support of Plaintiff's Motion for Class Certification (Dkt. 52-1, hereinafter, the "Report"). The entire premise of the Report is deeply flawed in numerous ways.

6. The Report assumes that the monthly rate that a local New York utility charges is equivalent to the market rate during that month. This simply is not true. The monthly rate that a local New York utility charges is not reflective of what the market rate is during that month. Indeed, the rate that a local New York utility charges during a particular month reflects a combination of the local utility's prediction of what wholesale rates will be during the month and reconciliations to true-up past period over and under charges based on actual wholesale pricing experienced. In other words, the difference in a local utility's predicted costs and the actual costs are accounted for by charging their customers more or less (as the case may be) over time.

7. For example, Dr. Felder's analysis regarding Niagara Mohawk Power's rates misses the mark. Using the time periods and data provided in Exhibit A of the Report, a simple analysis can be performed to illustrate utility default rates. Attached hereto as Exhibit 1 is a reproduction of the data provided in Exhibit A of the Report (pages 46 through 61). Only the farthest right column contains new data. The farthest right column shows the resulting amount

when NAPG's "cost of goods sold" (or "COGS" as listed by Dr. Felder) is subtracted from the Utility Rate.

8. If Dr. Felder's assumption that the local utility rate was the same as the market rate were correct, then subtracting the market commodity cost (using NAPG's "cost of goods sold" or "COGS") from the utility default rate would demonstrate the non-commodity portion of the utility rate. Dr. Felder assumes that this value would be fairly constant. It is not. Instead, the non-commodity portion of the utility rate for each of the local utilities ranges drastically.

9. The rate for Niagara Mohawk Zone F ranges from 9.5 cents above the so-called "market rate" in February 2014 to 5.2 cents below in April 2015. For New York State Electric and Gas, the rate ranges from 8.1 cents above the so-called "market rate" in May 2014 to 4.8 cents below in April 2015. For Orange & Rockland, the rate ranges from 5.9 cents above the so-called "market rate" in March 2014 to 4.3 cents below in March 2015. For Rochester Gas & Electric, the rate ranges from 7.6 cents above the so-called "market rate" in April 2014 to 5.0 cents below in April 2015.

10. Therefore, there is no way that the utility monthly rate charged to default customers could be any more than tangentially related to the monthly cost of electricity that the particular public utility actually pays.

11. Utility default rates in New York State have nothing to do with market costs, because they are set in advance of market costs being known. Con Edison may be an exception because they do not publish a monthly rate. Instead they charge their customers a rate that changes daily and is based on daily wholesale costs experienced. Using Con Edison's monthly rate as a basis for comparison is nonsensical because it simply doesn't exist. Monthly utility default prices in New York simply do not reflect actual short-term, monthly market costs. Dr. Felder's

contention that utility default prices in New York are based on "wholesale prices", "wholesale rates", or the "daily market rate" is completely false.

12. The cost to a local utility for energy could be, and often is, the current cost of energy averaged with the price of prior months and the prior year. A trend analysis of the long term average of a local utility's individual monthly rates may demonstrate an approximation of the market rate when averaged over a long period of time, but current utility rates simply do not reflect the current cost of energy to that utility

13. It is also likely that some utilities purchase energy months in advance through hedging. Where this is done, the usefulness of a utility rate as a proxy for the current market cost is further destroyed. Policies on hedging and reconciling over collections and under collections will vary from utility to utility, as no two utilities conduct business in precisely the same manner. Since utilities conduct their business in varying manners, their costs will vary.

14. NAPG does not typically expect negative margins in winter months, but with swings in temperature, such as with the polar vortex in the Winter of 2013-2014, and the resultant high record-breaking sustained wholesale costs in New York State, NAPG suffered significant losses in that winter. Accordingly, NAPG maintained a higher rate in the following months to recoup severe losses it sustained from the previous months during the exceptionally cold winter. Over the somewhat extended period, NAPG's rates were certainly based on its wholesale energy and business operating costs.

15. For example, I understand that Plaintiff Marsh complained about her NAPG rates being higher than the Central Hudson's rates during the time she was on NAPG's variable rate plan. Notwithstanding that she could have elected to be on a fixed rate of under 8 cents per kilowatt hour for twelve months, or could have elected after the expiration of her initial four-month fixed

rate to sign up for a fixed rate of 11 cents per kilowatt hour, her rate was actually nearly 10 cents lower than Central Hudson's rate for the first two months she was with NAPG, and 2.4 cents lower for the third and fourth months she was with NAPG, which provided her with a significant cost savings for electricity consumption during one of the coldest winters on record.

16. The following chart illustrates the rate in cents per kilowatt hour Ms. Marsh paid versus the rate that NAPG paid during the relevant time period of Ms. March's variable rate plan:

| Billing Period | Central Hudson Rate | NAPG Rate for Marsh | Rate Actually Paid by NAPG for power | Difference Rate Paid By NAPG and Amount Paid by Marsh |
|---|---|---|---|---|
| 1/17/14-3/17/14 | $0.0640 | $0.0699 | $0.167 | -$0.097 |
| 3/18/14-5/19/14 | $0.1425 | $0.0699 | $0.094 | -$0.024 |
| 5/19/14-7/17/14 | $0.0698 | $0.1574 | $0.101 | $0.056 |
| 7/17/14-9/17/14 | $0.0722 | $0.1499 | $0.102 | $0.048 |
| 9/17/14-11/14/14 | $0.0902 | $0.1599 | $0.101 | $0.059 |
| 11/14/14-1/15/15 | $0.0798 | $0.1739 | $0.093 | $0.081 |
| **Average** | **$0.0864** | **$0.1301** | **$0.110** | **$0.012**[1] |

17. It should be noted that the total billing rate for Ms. Marsh during this period averaged $0.012/kWh above NAPG's cost when including the refund check for $126.22 that she received. However, the average of Ms. Marsh's individual monthly rates during the time period she was with NAPG was 4 cents per kilowatt hour more than the local utility.

---

[1] The actual "average" of this column is $0.0205. However, a refund check issued to Ms. Marsh in the amount of $126.22 lowers the effective rate of NAPG's "profit" to 1.2 cents per kilowatt hour. *See* ¶ 17.

18.     The following chart illustrates the rate Ms. Claridge paid versus the rate that NAPG paid during the relevant time period of Ms. Claridge's variable rate plan:

| Billing Period | NMP Rate | NAPG Rate Claridge | Rate Actually Paid by NAPG for power | Difference Rate Paid By NAPG and Amount Paid by Claridge |
|---|---|---|---|---|
| 1/7/14-2/5/14 | $0.0729 | $0.0549 | $0.1656 | -$0.1107 |
| 2/5/14-3/8/14 | $0.1169 | $0.0549 | $0.1326 | -$0.0777 |
| 3/8/14-4/5/14 | $0.0802 | $0.0549 | $0.0975 | -$0.0426 |
| 4/5/14-5/8/14 | $0.0602 | $0.1599 | $0.0783 | $0.0816 |
| 5/8/14-6/6/14 | $0.0674 | $0.1599 | $0.0792 | $0.0807 |
| 6/6/14-7/7/14 | $0.0709 | $0.1399 | $0.0833 | $0.0566 |
| 7/7/14-8/6/14 | $0.0799 | $0.1399 | $0.0827 | $0.0572 |
| **Average** | **$0.0783** | **$0.1092** | **$0.1027** | **-$0.0630**[2] |

19.     It should be noted that the total billing for Ms. Claridge during this period averaged $0.063/kWh below our cost when including the $50.00 sign up bonus and a $50.00 customer accommodation certificate. That is, NAPG actually lost money on Ms. Claridge. This is in spite of the fact that the average of Ms. Claridge's individual monthly rates during the time period she was with NAPG was 3 cents per kilowatt hour more than the local utility.

---

[2] The actual "average" of this column is $0.006. However, the $50.00 sign-up bonus and $50.00 customer accommodation certificate lowers the effective rate of NAPG's "profit" to negative 6.3 cents per kilowatt hour. That is, NAPG lost money on Ms. Claridge. *See* ¶ 19.

20. For these reasons, NAPG's variable rates are, in fact, market based, but can vary widely from local utilities that operate in their own, monopoly-supported markets where the operating costs of providing commodity service are not reflected in their energy rate.

21. Since New York utilities charge monthly rates that are not representative of the monthly market rate, a comparison of the utility's rate to NAPG's rate is not an indication that NAPG's rate is not market based.

22. NAPG is not a local utility. NAPG's customer base is different from that of any local utility. Amongst other things, NAPG has a different number of customers and total demand. NAPG has different amounts of cash reserves, and it has different contracts for the purchase of energy. Local utilities are positioned to spread short-term fluctuations in energy costs out over a longer period of time, insulating themselves and their consumers from short-term price fluctuations.

23. NAPG supplies electricity in eleven different states. NAPG's profit is not dependent on the cost of its purchase of commodity in any single geographic region, and cannot be determined on an individual or monthly basis. Numerous factors go into calculating NAPG's profit, including NAPG's operating costs, including but not limited to billing, accounting, finance, legal, regulatory, customer service, collections, and marketing costs. Calculating NAPG's profit based solely on the cost of commodity purchase in any specific region completely ignores these costs and ignores the fact that NAPG is not a local utility.

24. For the foregoing reasons, isolating a single utility's default rate in a single month and comparing that rate to NAPG's rate during that same month will not provide an accurate representation of NAPG's profit or the relationship of NAPG's rates to the market rate.

25. From 2010 to 2013, NAPG's profit margin ranged from a loss of 5.5% to a gain of

4.0%.

26.     In my experience, the profit margins for local utilities are significantly higher, often in the range of gains of 8 to 10%.

I declare under penalty of perjury that the foregoing is true and correct.

_____
WILLIAM KINNEARY