UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE CLARIDGE and HELEN MARSH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH AMERICAN POWER & GAS, LLC,<br><br>Defendant. | Civil Action<br><br>Case No: 15-cv-1261 |

REPLY MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

D. Greg Blankinship
Todd S. Garber
Antonino B. Roman
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
445 Hamilton Avenue
White Plains, New York 10601

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068

Matthew D. Schelkopf
Joseph B. Kenney
**MCCUNEWRIGHT LLP**
1055 Westlakes, Suite 300
Berwyn, Pennsylvania 19312

*Attorneys for Plaintiffs and the putative class*

{00278066 }

**TABLE OF CONTENTS**

**Page No.**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

I.      Reasonable Consumers, Including Plaintiffs
Would Expect NAPG's Variable Market Based
Rate To Reflect Changes In Wholesale Commodity Electricity Costs................................1

II.     Minor Differences In The Costs NAPG Incurs
To Purchase Wholesale Electricity For Consumers In
Different Utility Regions Do Not Create Predominating Individual Issues ........................3

III.    NAPG's Potential Defenses Do Not Create Predominating Individual Issues....................7

IV.    Plaintiffs' Claims And Experiences Are Typical Of Those In the Putative Class...............8

        A.      Julie Claridge's Claims And Experiences Are Typical ...........................................8

        B.      Helen Marsh's Claims And Experiences Are Typical.............................................9

V.     Class Action Is The Superior Method For Adjudicating The Class's Claims ...................10

CONCLUSION......................................................................................................................11

# **TABLE OF AUTHORITIES**

**Cases**

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,*
   222 F.3d 52 (2d Cir. 2000) .................................................................................................. 10

*Berland v. Mack,*
   48 F.R.D. 121 (S.D.N.Y. 1969) ........................................................................................... 11

*Dupler v. Costco Wholesale Corp.,*
   249 F.R.D. 29 (E.D.N.Y. 2008) ............................................................................................. 8

*In re Nassau Cty. Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006) .................................................................................................. 7

*In re Scotts EZ Seed Litig.,*
   304 F.R.D. 397 (S.D.N.Y. 2015) ........................................................................................... 3

*Jermyn v. Best Buy Stores, L.P.,*
   2010 WL 5187746 (S.D.N.Y. Dec. 6, 2010) ....................................................................... 11

*Liberty Mut. Ins. Co. v. Fairbanks Co.,*
   2016 WL 1169511 (S.D.N.Y. Mar. 22, 2016) ....................................................................... 3

*McCracken v. Verisma Sys., Inc.,*
   131 F. Supp. 3d 38 (W.D.N.Y. 2015) .................................................................................... 8

*Oquendo v. CCC Terek,*
   111 F. Supp. 3d 389 (S.D.N.Y. 2015) ................................................................................... 3

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.,*
   647 N.E.2d 741 (N.Y. 1995) ................................................................................................. 3

*Seijas v. Republic of Argentina,*
   606 F.3d 53 (2d Cir. 2010) ........................................................................................... 6, 7, 11

*Spiro v. Healthport Techs., LLC,*
   73 F. Supp. 3d 259 (S.D.N.Y. 2014) ..................................................................................... 8

*Steinberg v. Nationwide Mut. Ins. Co.,*
   224 F.R.D. 67 (E.D.N.Y. 2004) ............................................................................................. 2

*Town of Oyster Bay v. Lizza Indus., Inc.,*
   22 N.Y.3d 1024 (2013) .......................................................................................................... 7

**Statutes**

N.Y. G.B.L. § 349 ............................................................................................................ 3, 7, 8

**Rules**

Fed. R. Civ. P. 23 .............................................................................................................. passim

**INTRODUCTION**

Defendant North American Power & Gas, LLC ("NAPG") proffers a scattershot of factual observations hoping to create the appearance of individualized issues. But NAPG does not contest that: every class member, including Plaintiffs, received a uniform customer agreement representing that customers not on the fixed rate will receive a "market based variable rate"; that NAPG can identify every class member who was on a variable rate, what that rate was, and how much their resulting bill was; or that Dr. Frank Felder can calculate what NAPG's rate should have been had it actually charged a market based variable rate. Thus, the liability of the class and each class members' damages can be determined using a common set of proof, and therefore individual issues will not predominate this litigation.

**I.   Reasonable Consumers, Including Plaintiffs, Would Expect NAPG's Variable Market Based Rate To Reflect Changes In Wholesale Commodity Electricity Costs.**

Plaintiffs and the putative class's claims all arise from one uniform NAPG representation contained in the form contract that all New York customers receive, namely that NAPG's "variable market based rate" would be based on "market prices for commodity, transportation, balancing fees, storage charges, North American Power fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose any such charges." Complaint ¶ 19 (Dkt. No. 1). There is no ambiguity as to the meaning of this clause. To the contrary, NAPG submitted 16 declarations from consumers who received the uniform customer agreement, and each one of them agreed that "the terms and conditions of my energy supply agreement are clear and unambiguous." Dkt. No. 60-7.[1] As

---

[1] Why NAPG submitted these declarations is a mystery, as not a single one is from a customer who was ever on a variable rate (meaning none of them are from class members), as evidenced by the fact that none of them were included in the account level data previously produced by NAPG for all its variable rate electricity customers in New York. Telling, NAPG was unable to find a single variable rate customer who was satisfied with the rate they were charged.

William Kinneary, NAPG's president, explained, the meaning of each of the factors identified in the variable pricing clause is straightforward:

- commodity refers to the wholesale cost of the electricity NAPG purchases for New York customers using British Petroleum as its agent;[2]
- transportation, balancing fees, and storage fees are all market fees associated with purchasing wholesale electricity that are included in the invoices from British Petroleum that NAPG pays;[3]
- North American Power fees is a "catch all" category that includes the cost of "renewable energy credits," and line losses refers to a charge from the utility resulting from the loss of a certain percentage of transmitted electricity (a charge NAPG tracks in its pricing spreadsheets, such as NAPG002320, attached as Exhibit 1 to the Blankinship Reply Dec.);[4]
- profit is a term any reasonable consumer understands;
- and applicable taxes and other charges plainly refers to taxes and fees NAPG has to pay, which are in fact limited to gross receipt taxes, New York ISO charges for electricity, and storage and billing services from utility companies.[5]

The interpretation of the meaning of this form clause does not raise individualized issues. *See Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action . . .")). Defendant's contention is also belied by Defendant's prior position that the contracts were written in "very plain English" with "unambiguous language." Dkt. No. 22 at 2, Dkt. No. 18 at 4.[6]

Moreover, with respect to the putative class's N.Y. G.B.L. § 349 claim, the issue is not how individual class members subjectively understand the representations sent in the Welcome

---

[2] *See* March 17, 2016 Deposition of William Kinneary ("March 17 Dep.," relevant portions of which are attached as Exhibit 2 to the Reply Declaration of D. Greg Blankinship ("Blankinship Reply Dec.")) at 48:16-25.

[3] April 7, 2016 Deposition of William Kinneary ("April 7 Dep.," relevant portions of which are attached as Exhibit 3 to the Blankinship Reply Dec.) at 39:21-40:19, 104:8-19; March 17 Dep. at 35:3-8, 50:21-51:10, 174:2-5.

[4] March 17 Dep. at 53:24-54:13; 52:16-25.

[5] April 7 Dep. at 40:20-41:24, 105:8-17.

[6] In its Order denying Defendant's motion to dismiss, this Court noted that the contract is ambiguous, but that was with respect to the portion of the agreement that explains how the bill is calculated in terms of multiplying the rate by the amount of kilowatts used, not with respect to the meaning of the variable rate clause. *See* Order, Dkt. No. 28 at 8.

Packet but rather how a reasonable consumer would understand the statement.  *See Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995).  Therefore common issues predominate.  *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) ("Classwide evidence will be used to establish whether Scotts's labeling . . . was likely to mislead a reasonable consumer acting reasonably under the circumstances.").

Defendant also contends that consumers have different sales experiences that lead them to sign up for NAPG's electricity service.  Def. Mem. at 2.  But Mr. Kinneary testified that NAPG is careful to ensure that it transmits a consistent message regardless of the sales channel used.[7]  Moreover, Plaintiffs and the class's claims arise from statements made in the Welcome Packet; and NAPG confirms that every single customer received that packet and the uniform customer agreement contained therein.  *See* April 7 Dep. at 34:12-21.  Defendant points to nothing that indicates that anything said or stated in the various sales channels is in any way inconsistent with the uniform customer agreements.

And with respect to the class's contract claims, the parol evidence rule precludes consideration of any statement or communications made prior to the effective date of the contract.[8]  Moreover, the agreement contains an integration clause that precludes consideration of extra-contractual representations or statements.  *See Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 412 (S.D.N.Y. 2015).

## II.     Minor Differences In The Costs NAPG Incurs To Purchase Wholesale Electricity For Consumers In Different Utility Regions Do Not Create Predominating Individual Issues.

---

[7] Q. "[Y]ou testified that North American Power works hard to make sure that its . . . marketing message is consistent across the various marketing channels; is that also true in New York?" A. "Yes, it is."  April 7 Dep. at 23:4-10.

[8] *See Liberty Mut. Ins. Co. v. Fairbanks Co.*, No. 13-3755, 2016 WL 1169511, at *5 (S.D.N.Y. Mar. 22, 2016) ("If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.").

Defendant contends that the variety of factors that go into different class members' variable rates preclude class certification. Def. Mem. at 2-3, 15-16. To the contrary, NAPG uses the same cost factors when setting the variable rate each month for all customers in each of the eight New York utility regions, and it does so using a single Excel spreadsheet. In fact, the process by which NAPG sets its rates is quite simple, as are the records reflecting the costs NAPG actually incurs, the rate it charges, and the profit it reaped each month. Prior to the start of each month, NAPG purchases what it believed to be sufficient electricity for its customers for the month. It does so not on the daily spot market, but in the form of hedging or futures contracts at a price set in advance. *See* April 7 Dep. 68:1-10, 72:14-73:17. Because NAPG lacks sufficient credit, it must pay British Petroleum a substantial fee to act as its agent. *Id.* at 78:10-19; March 17 Dep. at 72:3-12. British Petroleum invoices NAPG for the wholesale commodity price of electricity along with ancillary costs such as transportation, balancing and storage and other fees. April 7 Dep. at 41:25-42:15, 77:16-23, 89:14-90:14, 104:8-19. Other costs NAPG incurs, such as taxes and line loss fees, come from the utility. *Id.* at 93:3-25, 105:8-17. NAPG tracks all of these costs, and Dr. Felder accounted for all of these costs in his analysis.

In fact, when Mr. Kinneary and NAPG determine the variable rate for each month, they use a single spreadsheet that identifies all of the costs NAPG incurs (because it has already purchased the electricity for the coming month). *See* April 7 Dep. at 96:17-98:1; *see, e.g.,* NAPG002320 (Exhibit 1 to the Blankinship Reply Dec.). It is thus quite easy not only to identify what the exact variable rate was for class members in the different utility regions, but Plaintiffs can identify the actual costs NAPG incurred – and it is those market costs that NAPG promised to use as a basis for its variable market based rate. Defendant also mischaracterizes the record when it contends that "Plaintiffs would be hard-pressed to show that NAPG charges the

same variable or fixed rate to *any* two people . . ." Def. Mem. at 15.[9] Indeed, this argument is directly contradicted by the sworn testimony of Mr. Kinneary, who confirmed in three different depositions that NAPG has one variable rate at any one time within each utility region.[10]

NAPG also contends that the manner in which a customer comes to be on the variable rate raises individual issues. Def. Mem. at 15. Not so. Each and every customer agreement explains that customers whose fixed or introductory rate expires will be switched to a variable rate unless they sign up for another fixed rate. Dkt. Nos. 56-4 and 56-6 at 4. And both Ms. Claridge and Ms. Marsh understood that they would be placed on a variable rate after their fixed rate expired.[11] Mr. Kinneary conceded that it is the uniform customer agreement that governs the relationship between NAPG and all of its customers, and that it is the same variable rate disclosure that governs the rate that should be charged to each customer regardless of the reason they ended up on the variable rate. April 7 Dep. at 43:6-19, 51:23-53:15.[12]

---

[9] Of course, Plaintiffs need not show anything with respect to customers on a fixed rate as the class only consists of class members who paid a variable rate. NAPG also contends that there are some customers on a rate that is neither a fixed nor variable rate. Def. Mem. at 15-16. But the class is comprised of only those who *paid* the variable rate, and NAPG's data identifies each customer who was on a rate other than a fixed or variable rate. Thus, the class will not be comprised of those on the step-up or accommodation rate for those transitioning from the fixed to the variable rate, those receiving a green rate, or those who received a network rate. *See* April 7 Dep. at 25:11-21, 80:5-81:4; March 17 Dep. at 98:9-99:6.

[10] *See* February 24, 2015 Deposition of William Kinneary ("February 24 Dep.," relevant portions of which are attached as Exhibit 4 to the Blankinship Reply Dec.) at 55:17-22; March 17 Dep. at 45:17-23; April 7 Dep. at 79:3-9. That there are eight different utilities with customers receiving NAPG supplied electricity does not create individualized issues. To the contrary, NAPG tracks its costs and rates for all of the New York utilities on one spreadsheet, and Dr. Felder can easily identify and calculate damages for each customer within the different utility regions. *See* Felder Report (Dkt. No. 56-1).

[11] *See* May 5, 2016 Deposition of Julie Claridge ("Claridge Dep.," Exhibit 5 to the Blankinship Reply Dep.) at 15:9-16; May 6, 2016 Deposition of Helen Marsh ("Marsh Dep.," Exhibit 6 to the Blankinship Reply Dec.) at 15:13-20.

[12] NAPG appears to contend that it is a customers' fault if they are gouged while on the variable rate because they should have signed on to a fixed rate. *See* Customer Declarations, Dkt. No. 60-7 ("I recognize that, as an NAPG customer, it is my obligation to be aware of the end date of my fixed price term so that I can enjoy the continued benefits of energy competition.") and Def. Mem. at 8, 9. But the agreement does not inform customers that they will not enjoy "the benefits of energy competition" if they end up on the variable rate; to the contrary, they are informed the rate is "market based."

Ultimately, NAPG's argument is that damages amongst class members will differ because the rate as between different utility regions and the extent to which NAPG overcharged its customers differ. But "[i]t is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (citation omitted). Moreover, NAPG does not contest that Dr. Felder can calculate damages for each class member using a common set of data produced by NAPG and publicly available market data, thus obviating any predominance concerns. Dr. Felder has demonstrated that he can calculate the rate NAPG should have charged customers had it charged a rate reflecting market costs, measured either by the rates utilities charge, themselves a reflection of market rates, or by NAPG's costs. *See* Dkt. No. 56-1.

Indeed, in its attempt to discredit Dr. Felder's report, NAPG supports his reasoning. In his declaration, Mr. Kinneary (without support or authority) self-servingly opines that utility rates are not in fact reflective of market conditions. Using publicly available information from the utilities themselves, Dr. Felder handily refutes this claim. *See* Felder Rebuttal Report (attached as Exhibit 7 to the Blankinship Reply Dec.). Mr. Kinneary seeks to support his claim by charting the relationship between NAPG's costs of purchasing wholesale electricity (its costs of goods sold or "COGS") with utility rates, the claim being that the disconnect between NAPG's market costs and utility rates shows that the latter do not reflect market prices. But Dr. Felder turns this analysis on its head. Taking NAPG's assumption that its COGS accurately reflects market costs, Dr. Felder charts the relationship between NAPG's costs and its variable rate. If, as NAPG contends, its costs of goods sold is reflective of market costs, and if, as it promised, its rate is a market based variable rate, then the relationship between NAPG's costs should be commensurate (even allowing that the rate can be somewhat higher than costs to

account for a profit). But, as demonstrated by Exhibit 1 to the Felder Rebuttal Report, there is no such relationship. Instead, it is apparent that not only does NAPG charge a rate divorced from its actual costs, but there is a steady increase in the amount it overcharges its customers. *Id.* In other words, regardless of its costs, NAPG's variable rate steadily increases because it is engaging in deceptive price gouging.

### III.   NAPG's Potential Defenses Do Not Create Predominating Individual Issues.

Defendant contends that it has affirmative defenses as to some class members. Def. Mem. at 17. But Defendant fails to inform the Court that the Second Circuit has consistently held that "although a defense may arise and may affect different class members differently, [this occurrence] does not compel a finding that individual issues predominate over common ones. So long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (internal citations omitted). Plaintiffs' common issues bind members of the proposed classes together, and thus the affirmative defenses are subject to generalized proof.

Defendant contends that some members of the class might have claims predating the start of the three year statutory period applicable to N.Y. G.B.L § 349 claims. Def. Mem. at 18. But the statutory period for Plaintiffs' and the class's contract claim is 6 years (*see Town of Oyster Bay v. Lizza Indus., Inc.*, 22 N.Y.3d 1024, 1030 (2013)) and NAP has only operated in New York since 2011. This exact issue was summarily rejected by the Court in *Jermyn v. Best Buy Stores, L.P.*, where the Court certified both a N.Y. G.B.L § 349 with its three year statute of limitations and an unjust enrichment claim with its six year statute of limitations. 256 F.R.D. 418, 430 (S.D.N.Y. 2009) ("A statute of limitations defense does not affect commonality.").

Defendant also contends that some class members will be subject to the voluntary payment doctrine defense. But this defense does not preclude class certification. *See Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008) (finding voluntary payment doctrine did not preclude class certification brought under N.Y. G.B.L § 349 as "far from being atypical, the voluntary payment doctrine issue may be common to numerous class members"). Moreover, the voluntary payment doctrine presumes that class members have full knowledge of the facts. *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 50 (W.D.N.Y. 2015) (declining to apply voluntary payment doctrine to the plaintiffs N.Y. G.B.L § 349 claim and holding that "[t]he voluntary payment doctrine is a creature of common-law which bars recovery of payments voluntarily made *with full knowledge of the facts*, and in the *absence of fraud* or mistake of material fact or law.") (emphasis in original). As Plaintiffs and class members did not have full knowledge of the facts, including that NAPG's rate was not in fact based on the actual wholesale costs NAPG incurred, the voluntary payment doctrine does not apply. *See Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 275 (S.D.N.Y. 2014) ("That . . . plaintiffs 'voluntarily agreed' to pay this figure, does not preclude a claim under Section 349(a), where defendants allegedly failed to disclose that their actual costs were below that figure.").[13]

## IV. Plaintiffs' Claims And Experiences Are Typical Of Those In the Putative Class.

### A. Julie Claridge's Claims And Experiences Are Typical.

NAPG claims that Ms. Claridge's claims are not typical because she was also upset that NAPG did not switch her to a new fixed rate plan after her old one expired. Def. Mem. at 2. Of course, the mere fact that NAPG is guilty of other misdeeds does not mean Plaintiff's claims are

---

[13] Defendant contends that some class members are subject to waiver and accord and satisfaction defenses, Def. Mem. at 17, presumably because they accepted a settlement offer from NAPG when they complained about excessive rates. But NAPG provides no information as to how many such customers there are, and because NAPG can identify all such customers, they can easily be excluded from the class.

not typical with respect to the use of the variable rate to overcharge consumers. Moreover, NAPG contends that Ms. Claridge was switched to the variable rate because she did not renew her fixed rate before the deadline, a requirement that is included in the customer agreement. *See* Dkt. 56-4; Dkt. No. 56-6.[14]

Defendant is also wrong when it contends that Ms. Claridge did not understand the basis of her claim that NAPG overcharged her by not charging a market based variable rate.[15]

To the contrary, as Ms. Claridge cogently explained:

- She was not "happy with the variable market rate."[16]
- "[R]emember[s] reading that [her] rate would be based on the market, the variable market price, which could be a different price than [her] original fixed price . . . ."[17]
- She understood that NAPG's "variable rate depends on the current market prices of commodities, and therefore, the variable rate does change up and down with the commodity rate. Commodities like power, oil."[18]
- NAPG's variable rate "shouldn't be grossly inflated if National Grid's electrical supplies haven't gone up, and the other commodities remain the same, then this one [the variable rate] should follow suit."[19]

### B.   Helen Marsh's Claims And Experiences Are Typical.

Defendant contends that Ms. Marsh's claims are not typical because she relied on a phone call with an NAPG representative rather than the customer agreement. Def. Mem. at 2.

---

[14] Defendant mistakenly contends that Ms. Claridge's claims are not typical because the rates she paid were less than the utility rate for six months. Def. Mem. at 2. In fact, her rate was lower for three months when she was on the fixed rate (not a period of time for which she seeks damages), but as soon as her fixed rate expired after three months, her rate skyrocketed to $0.1599, significantly higher than the $0.06024 rate her local utility was charging. Complaint ¶ 25.

[15] NAPG also contends that Ms. Claridge is not adequate because she did not know whether she was on a variable or fixed rate for the last three months. Def. Mem. at 2. Not so. *See* Claridge Dep. at 13:5-19 (Q. So what happened? Did the rate go to the variable market rate as you just said? A. That is correct. It went to the variable market rate. Q. Were you happy with that variable market rate? A. No, I was not.).

[16] Claridge Deposition at 13:5-18.

[17] *Id.* at 15:9-16.

[18] *Id.* at 36:13-19, 40:5-15 ("Commodities are like power, or oil, or grain, and that's like on the stock market. They fluctuate on a daily basis. . . . And therefore, rates go up and down. The market, the variable market rate goes up and down.").

[19] *Id.* at 86:6-87:3.

Not so.  NAPG in fact contends that every customer received the Welcome Packet,[20] and it produced one with Ms. Marsh's name and address.  *See* Dkt. No. 56-6.  For her part, and 2.5 years removed, Ms. Marsh could not recall one way or the other whether she received the customer agreement.  Marsh Dep. at 81:18-82:15.  But Ms. Marsh did testify that it was her practice to read customer agreements she receives in the mail (*id.* at 153:9-12), and it is reasonable to presume that she did so.  The fact that a customer cannot recall the specifics of a 2.5 year old mailing neither calls into question her adequacy or the fact that she received and read the agreement, just as NAPG expected her to do.[21]

Ms. Marsh may not have recalled the exact source of her understanding that NAPG's rate would be market based, but she did recall NAPG's promise to charge her a market rate, and the fact that it did not is the basis of her claim.  As she testified, "I brought this lawsuit because I was in a four-month fixed rate agreement with NAPG, at 6.9 cent rate for four months. After the four months it jumped to a variable rate which was phenomenally higher than the daily market rate, and I feel I am being very ripped off."[22]   Ms. Marsh also testified that she knew that the variable rate would be based on the "daily market price" meaning the "commodity rate, the competitive rate of other electric energy sources."  *Id.* at 11:18-12:5, 15:13-20.[23]

V. **A Class Action Is The Superior Method For Adjudicating The Class's Claims.**

---

[20] *See* April 7 Dep. at 34:12-21.

[21] In any event, "[t]he Supreme Court . . . expressly disapproved attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,* 222 F.3d 52, 61 (2d Cir. 2000) (citation omitted).

[22] Marsh Dep. at 11:2-10,  15:13-20 ("[T]hey [NAPG] told me that the rates would be at market price after four month period and they were not.  They were astronomically higher than what I was told.").

[23] Defendant also disparagingly contends that Ms. Marsh may not represent the class because she did not pay her electricity bills.  Def. Mem. at 3, 17.  Not so; Ms. Marsh may have been behind in her bills on occasion (in large part due to NAPG's outrageous charges), but she ultimately paid her NAPG charges in their entirety.  *See* Marsh Dep. at 114:25-115:5; 12:3-8.  It is not a coincidence that NAPG fails to offer any proof for its accusation of non-payment.

NAPG contends that a class action is not superior because Plaintiffs have not demonstrated that notice can be managed. Def. Mem. at 24. Nonsense. NAPG does not contest that it can ascertain the identity of every single customer who was on a variable rate, and NAPG has each customers mailing address. *See* February 24 Dep. at 39:11-46:20; March 17 Dep. at 13:5-16, 27:21-25, 33:20-24, 115:13-15. Thus, notice will be effectuated by direct mail, the best notice practicable.[24] Indeed, two courts in this District have already approved direct mail notice for classes comprised of ESCO customers. *See Chen v. Hiko Energy, LLC*, No. 14-1771 (S.D.N.Y.), Dkt. No. 73, and *Wise v. Energy Plus Holding, LLC,* No. 11-7345 (S.D.N.Y.), Dkt. No. 42.

Defendant also avers that other procedural devices may be used. But other than listing miscellaneous notions like "attorney groups" or "creative scheduling," Defendant offers neither authority nor explanation for the notion that other procedures would be more effective than a class action. It is well settled that where, as here, class members' claims are too small to justify individual lawsuits, the class procedure is superior. *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request the Court grant Plaintiffs' motion for class certification.

---

[24] *See Berland v. Mack*, 48 F.R.D. 121, 129 (S.D.N.Y. 1969) ("Where members of the class are readily identifiable and personal notice would not be so prohibitively expensive as to prevent the class action from being prosecuted, individual notices by first class mail would in most cases be the 'best notice practicable.'"); *Jermyn v. Best Buy Stores, L.P.*, No. 08-00214, 2010 WL 5187746, at *2 (S.D.N.Y. Dec. 6, 2010) (same).

DATED:  June 3, 2016

        **FINKELSTEIN, BLANKINSHIP,**
        **FREI-PEARSON & GARBER, LLP**

By: */s/ D. Greg Blankinship*
D. Greg Blankinship
445 Hamilton Avenue
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

Matthew D. Schelkopf
Joseph B. Kenney (*pro hac vice* forthcoming)
**McCuneWright LLP**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Tel: (610) 200-0581
Fax: (610) 727-4001
MDS@mccunewright.com
JBK@mccunewright.com

Matthew R. Mendelsohn
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068